IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


JOHN W. CROMEANS., JR., et al.,    )
    )
       Plaintiffs,    )
    )
      v.    )    No. 2:12-CV-04269-NKL
    )
MORGAN KEEGAN & CO., INC., et al.,    )
    )
       Defendants/Third-Party    )
       Plaintiff,    )
    )
      v.    )
    )
PERKINS COIE, LLP, et al.,    )
    )
       Third-Party Defendants.    )


## ORDER

Third-Party Defendant Perkins Coie, LLP ("Perkins Coie") moves to dismiss the Third-Party Complaint of Morgan Keegan & Co., Inc. ("Morgan Keegan") for lack of personal jurisdiction. [Doc. # 209]. For the reasons set forth below, Perkins Coie's motion is GRANTED.

## I.  Background

On July 15, 2010, the City of Moberly, Missouri ("the City") approved the issuance of $39 million in municipal bonds by the Industrial Development Authority of the City of Moberly ("the IDA"). Cunningham, Vogel and Rost ("CVR") served as counsel to both the City and the IDA in connection with the bond issue. The bonds were

issued by the IDA to finance a project that included acquiring and improving a 33 acre parcel of land as well as constructing and equipping a sucralose manufacturing and processing facility. This facility was to be operated by Mamtek U.S., Inc. ("Mamtek") a Delaware corporation registered to transact business in Missouri. During the process leading up to the sale of the bonds, the City selected Morgan Keegan & Company, Inc. ("Morgan Keegan") to serve as the underwriter for the bonds. Approximately 140 persons or entities purchased the bonds. Mamtek failed, however, and the bonds are now alleged to be worthless.

This putative class action was filed on behalf of the bond purchasers (collectively, the "Bondholders") against Morgan Keegan and others. The Bondholders' claims are based, in substantial part, on alleged material misrepresentations and omissions contained in the Official Offering Statement that was published in connection with the sale of the bonds. The Bondholders allege that Morgan Keegan, as underwriter, had a duty to conduct a due diligence investigation as to the accuracy of the representations in the Official Statement. Morgan Keegan subsequently filed a Third-Party Complaint for contribution and indemnity against Perkins Coie, Mamtek's intellectual property counsel during the relevant period.

## II.     Discussion

### A.     Personal Jurisdiction Generally

Perkins Coie argues that Morgan Keegan's Third-Party Complaint must be dismissed because the Court lacks personal jurisdiction over Perkins Coie, a partnership organized under the laws of the State of Washington with its principal place of business

in Seattle, Washington. In opposing Perkins Coie's motion, Morgan Keegan has the burden of proving facts sufficient to make a prima facie showing of personal jurisdiction. *See Miller v. Nippon Carbon Co., Ltd.*, 528 F.3d 1087, 1090 (8th Cir. 2008). Although Morgan Keegan must ultimately prove the existence of personal jurisdiction by a preponderance of the evidence, this need not occur "until trial or until the court holds an evidentiary hearing." *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991). Nonetheless, the requisite "prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and opposition thereto." *Miller*, 528 F.3d at 1090 (quotations omitted). In reviewing these materials, the Court must view the facts in the light most favorable to Morgan Keegan and resolve all factual conflicts in favor of Morgan Keegan. *See Dakota Indus., Inc.*, 946 F.2d at 1387.

Morgan Keegan maintains that Perkins Coie is subject to both specific and general personal jurisdiction. Specific personal jurisdiction, which "refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state," exists only to the extent permitted by Missouri's long-arm statute and the Due Process Clause of the Fourteenth Amendment. *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 593 (8th Cir. 2011) (quotation omitted). The requirements of Missouri's long-arm statute and the Due Process Clause present two, independent inquiries that must be addressed separately, and failure to satisfy either precludes the exercise of specific personal jurisdiction. *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 909-10 (8th Cir. 2012); *accord Viasystems, Inc.*, 646 F.3d at 593 n.2. If

specific jurisdiction does not exist, the Court must consider whether Perkins Coie is subject to general jurisdiction, meaning the authority of a state court to hear claims against a defendant regardless of where the cause of action arose, who is suing, or the subject matter of the litigation. *Miller*, 528 F.3d at 1091.

### B. Specific Jurisdiction

Morgan Keegan argues that specific jurisdiction over Perkins Coie is authorized under the provisions of the Missouri long-arm statute that confer jurisdiction over a nonresident defendant for causes of action arising from the transaction of business or the commission of a tort in Missouri. *See* Mo. Rev. Stat. § 506.500. "These individual categories are construed broadly, such that if a defendant commits one of the acts specified in the long-arm statute, the statute will be interpreted 'to provide for jurisdiction, within the specific categories enumerated in the statute[ ], to the full extent permitted by the [D]ue [P]rocess [C]lause.' " *Viasystems, Inc.*, 646 F.3d at 593 (alterations in original) (quoting *State ex rel. Metal Serv. Ctr. of Ga., Inc. v. Gaertner*, 677 S.W.2d 325, 327 (Mo. 1984)). Though construed broadly, the nonresident's commission of one of the statute's enumerated acts is an absolute prerequisite to jurisdiction, "and the cause of action must arise from the nonresident defendant's activities in Missouri." *Moog World Trade Corp. v. Bancomer, S.A.*, 90 F.3d 1382, 1384 (8th Cir. 1996).

With respect to specific jurisdiction, Perkins Coie submitted the following list of its contacts with Missouri that relate to the bond issue:

4

- June 7, 2010, letter from Michael Wise to Tom Cunningham of [CVR], directed to Mr. Cunningham's office in St. Louis, Missouri;

- June 2010, telephone conversation among Mr. Wise, Mr. Cunningham, and Corey Mehaffy, a representative of the City of Moberly, Missouri;

- July 2010, telephone conversation between Mr. Wise and Mr. Cunningham;

- July 2010, one mailing or email message from Perkins Coie that was mistakenly sent to Mr. Cunningham;

- July 22-23, 2010, e-mails between Mr. Wise and Mehaffy;

- July 22, 2010, letter from Mr. Wise to Mr. Cunningham;

- July 23, 2010, Mr. Wise's attendance at the groundbreaking ceremony in Moberly, Missouri;

- July 26, 2010, letter from Mr. Wise to Mr. Cunningham directed to Mr. Cunningham's office; and

- July 28, 2010, affidavit signed by Mr. Wise that, upon belief, was sent by Bruce Cole to Mr. Cunningham.

[Doc. # 213 at 1-2]. In addition to these contacts, Morgan Keegan claims that Perkins

Coie had the following contacts with Missouri related to the bond issue:

(1) items in its possession are referenced in the bond transcript; (2) its attorneys (not limited to Mr. Wise) prepared agreements and schedules for inclusion in the transcript of proceedings on the bond; (3) its attorneys corresponded with Third-Party Defendant Pellegrino & Associates, the valuation firm engaged to value Mamtek's intangible assets for the purpose of the Moberly bonds; (4) Perkins Coie was paid directly from the proceeds of the bonds; (5) Perkins Coie's representation of Mamtek US, which only ever had operations in Missouri, continued well into 2011 and included Missouri-specific issues; and (6) Mr. Wise gave testimony to the Missouri House Committee that investigated the Moberly Bonds, on which the Plaintiff intends to rely to prove his claims.

[Doc. # 235 at 8].

5

1.     *Neither Missouri's long-arm Statute nor the Due Process Clause permit the exercise of personal jurisdiction based on Perkins Coie's alleged transaction of business in Missouri*

Morgan Keegan claims that Perkins Coie transacted business in Missouri by virtue of its ongoing representation of Mamtek, "a Delaware corporation that proposed to build a manufacturing facility in Moberly, Missouri with financial aid from a municipal bond offering." [Doc. # 235 at 14]. The relevant provision of Missouri's long-arm statute is intended " 'to confer jurisdiction over nonresidents who enter into various kinds of transactions with residents of Missouri.' " *Capitol Indem. Corp. v. Citizens Nat. Bank of Fort Scott, N.A.*, 8 S.W.3d 893, 904 (Mo. Ct. App. 2000) (quoting *State ex rel. Metal Serv. Ctr. Of Ga., Inc. v. Gaertner*, 677 S.W.2d 325, 327 (Mo. 1984)). While broadly construed, this provision nonetheless requires a showing of some activity "on the part of the nonresident defendant within the state," and that the cause of action arises from this activity. *Sales Serv. Inc. v. Daewoo Int'l (Am.) Corp.*, 719 F.2d 971, 972-73 (8th Cir. 1983).

In this case, there is no evidence that Perkins Coie entered into any kind of business transaction in Missouri or with any resident of Missouri. Perkins Coie began providing legal services for Mamtek, generally with respect to intellectual property matters, in 2006, well prior to any of Mamtek's dealings in Missouri. [Doc. # 213 at 6]. Perkins Coie's attenuated involvement in those dealings arose purely as incident of this preexisting relationship. In particular, the evidence shows that, sometime in 2009, Perkins Coie, in its role as intellectual property counsel to Mamtek, came to possess various intellectual properties and other assets belonging to Mamtek. *See, e.g.*, [Doc. #

6

213 at 14-15]. On July 1, 2010, Mamtek pledged these materials as security for its obligations in connection with the bond issue and agreed to place them in escrow. *See* [Docs. ## 235-1, 235-2]. Perkins Coie was not a party to and assumed no rights or obligations under these agreements, although the specific materials pledged by Mamtek as described in Schedule 1 to the Escrow Agreement included "all documentation of" the relevant intellectual property "held by Perkins Coie," as well as certain "[t]rade secrets in the custody of Perkins Coie," and "[a]udit reports prepared by Perkins Coie, LLP documenting the foregoing." [Doc. # 235-1 at 4, 13-15].[1] There is also evidence that Perkins Coie was involved in drafting Schedule 1, [Doc. # 235-3 at 1-2], and Michael Wise of Perkins Coie later sent a letter to Tom Cunningham of CVR, summarizing his "actions in preparing and submitting documents for escrow as identified in . . . Schedule 1." [Doc. # 213 at 14-15, 17-18]. Wise also provided an affidavit in which he certified that the statements contained in his letter to CVR were true to the best of his knowledge. [Doc. # 213 at 20].

Although Morgan Keegan claims that Perkins Coie "provided extensive analysis of the proposed security for the Moberly, Missouri bond offering," [Doc. # 235-15], the record shows that Perkins Coie's analysis consisted of little more than cataloging the Mamtek materials in its possession. Morgan Keegan has presented no evidence or allegation that Perkins Coie ever offered an opinion regarding the value of the intellectual property or contracts that Mamtek placed in Perkins Coie's custody. In fact, the evidence

---

[1] An identical addendum was also attached as Exhibit A to the Guaranty Agreement. *See* [Doc. # 235-2 at 16-17].

shows that Perkins Coie unambiguously stated that it at all times relied on the representations of Mamtek concerning these documents and that it never attempted to independently verify Mamtek's representations. *E.g.*, [Doc. # 213 at 14-15]. Although Perkins Coie represented that it did in fact have in its possession the materials provided to it by Mamtek, this was the full extent of any verification provided by Perkins Coie with respect to these documents. In addition, any suggestion that Perkins Coie was responsible for appraising the intellectual property is undermined by Morgan Keegan's allegation that Pellegrino and Associates was specifically engaged for this purpose.

The limited legal services that Perkins Coie did provide as a result of its possession of the Mamtek materials were all performed outside of Missouri and solely for the benefit of Mamtek. [Docs. ## 213 at 7, 15, 18; 235-1 at 3]. Perkins Coie does not have any offices or own any real estate in Missouri and does not maintain an address, telephone number, or bank account in Missouri. [Doc. # 213 at 6]. Perkins Coie does not employ any individuals in Missouri and is not registered to do business in Missouri. [Doc. # 213 at 6]. There is no allegation or evidence that Perkins Coie executed any contracts in Missouri, with a Missouri resident, or that required performance in Missouri. There is also no allegation or evidence that Perkins Coie performed any legal services in Missouri or solicited any business from a Missouri resident in connection with Mamtek's dealings in Missouri.

Nonetheless, Morgan Keegan argues that Perkins Coie transacted business in Missouri because its "ongoing representation of Mamtek . . . required regular communications with numerous parties involved in the Moberly bond offering, [and]

numerous communications into Missouri." [Doc. # 235 at 14-15]. It is well-established, however, that "use of the mail or telephone communications, without more, does not constitute the transaction of business for purposes of long arm jurisdiction in Missouri." *Capitol Indem. Corp. v. Citizens Nat. Bank of Fort Scott, N.A.*, 8 S.W.3d 893, 903-04 (Mo. Ct. App. 2000) (collecting cases); *accord Arnold v. AT & T, Inc.*, 874 F. Supp. 2d 825, 833 (E.D. Mo. 2012). This rule is especially applicable in this case, because there is no evidence that Perkins Coie initiated any of these communications.

Rather, the evidence shows that Perkins Coie passively responded to communications it received from other parties, which Mamtek had urged to contact Perkins Coie. Specifically, Morgan Keegan cites: (1) an e-mail from Dan Vogel of CVR in which he "told Mike Pellegrino to expect that Mamtek would make Perkins Coie available to assist in the process;" (2) an e-mail from Mamtek's COO encouraging Pellegrino & Associates "to visit with Perkins Coie," and (3) a similar e-mail from Mamtek's COO encouraging Armstrong Teasdale "to contact Mr. Wise." [Doc. # 235 at 6, 10]. However, the unilateral actions of a party claiming a relationship with the nonresident defendant cannot give rise to the existence of personal jurisdiction. *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1432 (8th Cir. 1995); *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 235 (Mo. 2010). The fact that Perkins Coie had some, incidental contact with these entities shows at most that Perkins Coie responded, at its nonresident client's behest, to unsolicited requests from third-parties involved in the bond issue.

Perkins Coie's alleged correspondence with Pellegrino & Associates, which is based primarily on the e-mails cited above with the addition of a single telephone call, also fails to show that Perkins Coie transacted business in Missouri. Pellegrino & Associates is an Indiana corporation with its principal place of business in Indianapolis, Indiana, [Doc. # 158 at 2], and there is no evidence or allegation that Perkins Coie's correspondence with Pellegrino & Associates consisted of anything more than communication by telephone. If such communications do not constitute the transaction of business in Missouri even when directed to a Missouri resident, the same conclusion must necessarily be reached where the communication is with a foreign corporation.

Perkins Coie's additional Missouri contacts also fail to show that Perkins Coie transacted any business in Missouri. Perkins Coie only once physically visited Missouri, and this consisted of Michael Wise's attendance at the groundbreaking ceremony for the Moberly facility. [Doc. # 213 at 11-12]. Morgan Keegan has presented no argument or authority that suggests an attorney's polite appearance at the ceremonial groundbreaking of a factory amounts to transacting business in Missouri. Morgan Keegan has likewise failed to explain how Wise's testimony before a Missouri legislative committee in January of 2012, long after Perkins Coie terminated its representation of Mamtek, *see* [Docs. ## 213 at 6, 235-15 at 1-2], constitutes the transaction of business in Missouri.

In sum, the type of attenuated and passive involvement in a client's business dealings evidenced here cannot suffice to subject a law firm to personal jurisdiction in whichever state the client, at some point, chooses to conduct business. Although Mamtek apparently elected to use the bond proceeds to pay for some or all of Perkins Coie's

services, there is no evidence that Perkins Coie contracted to be paid, or was even aware that it was paid, from the bond proceeds. Accordingly, Mamtek's unilateral decision to use the bond proceeds to "make repayments on prior debt of Mamtek International," which included payments to Perkins Coie for services rendered before the Moberly project "had even become a concept," [Doc. # 235-7 at 6], does not show that Perkins Coie transacted business in Missouri.

Furthermore, even assuming that Perkins Coie transacted business in Missouri by cataloging the Mamtek documents in its possession at its office in Seattle, the present case does not arise from this activity. With respect to the security pledged by Mamtek, the Bondholders' claims are based solely on the allegedly erroneous valuation of these materials. *See* [Doc. # 66-1 at 15-21]. In particular, the Bondholders allege that the parties that prepared the Official Statement "did nothing but transcribe into the Offering Statement the statements given to them by Mamtek and its Agents," and, as a result, materially misrepresented Mamtek's market position and the value of the materials pledged "as security for the Bonds in the event of a default by Mamtek." [Doc. # 66-1 at 12, 15, 18-20]. The Bondholders do not claim that this intellectual property did not exist; in fact they allege that Mamtek's CEO "purchased the patents and intellectual properties from the plant [in China] for $500,000." [Doc. # 66-1 at 7].

Similarly, Morgan Keegan has not asserted that Perkins Coie did not hold the intellectual property as stated or that Schedule 1 to the Escrow Agreement was not properly prepared. In addition, Moragn Keegan acknowledges that Pelegrino & Associates was specifically engaged to provide "a valuation of the bond security," [Doc.

# 235 at 15], which is consistent with the Bondholders' allegations, [Doc. # 66-1 at 18, 20] ("Pellegrino valued the Mamtek's [*sic*] IP at more than $7,000,000.00. . . . This intellectual property is the same information Cole purchased from his Chinese operations for $500,000. This information was later deemed 'worthless.' "). Accordingly, there is no evidence that Morgan Keegan's or the Bondholders' claims arise out of the business transacted by Perkins Coie in Missouri. To the extent that Morgan Keegan claims that this case arises from Perkins Coie's communications with Missouri residents, this is simply a reiteration of Morgan Keegan's claim that Perkins Coie committed fraudulent or negligent misrepresentation in Missouri, which is addressed in more detail, below.

Finally, even if Missouri's long-arm statute were satisfied, the exercise of personal jurisdiction would not be permitted under the Due Process Clause, which "requires that a defendant have certain 'minimum contacts' with the forum state." *Myers*, 689 F.3d at 911. These contacts "must not arise due to mere fortuity, but must arise because the defendant has purposefully availed itself of the privilege of conducting activities in the state. *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011) (quotation omitted). The following five-factors are used to evaluate whether the defendant's contacts are sufficient to permit the exercise of personal jurisdiction:

> (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relationship of those contacts with the cause of action; (4) Missouri's interest in providing a forum for its residents; and (5) the convenience or inconvenience to the parties.

*Id.* The first of three factors are of primary importance, while the last two are only secondary factors. *Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd.*, 89

F.3d 519, 522 (8th Cir. 1996).  With respect to specific jurisdiction, this analysis requires consideration of whether the defendant "engaged in activities in the forum that reveal an intent to invoke or benefit from the protection of its laws."  *Pangaea, Inc.*, 647 F.3d at 746.

As set forth above, Perkins Coie's contacts with Missouri were very limited, both in quality and quantity, and arose as a mere fortuity of its preexisting relationship with Mamtek.  There is no indication that Perkins Coie, by providing out-of-state legal services for a nonresident client, evinced any intent to invoke or benefit from the laws of Missouri.  Furthermore, apart from Morgan Keegan's allegation that Perkins Coie made misrepresentations to parties in Missouri, an allegation that is unsubstantiated for the reasons discussed below, Perkins Coie's Missouri contacts are only marginally related to the present case.  Considering the limited nature of the services that Perkins Coie was asked to and did provide in connection with Mamtek's dealings in Missouri, subjecting Perkins Coie to personal jurisdiction based on the incidental contacts with Missouri these services required would offend traditional notions of fair play and substantial justice.

2. *Morgan Keegan has not made a prima facie showing that Perkins Coie committed a tortious act in Missouri*

Morgan Keegan alternatively claims that the Missouri long-arm statute is satisfied because Perkins Coie made fraudulent or negligent misrepresentations to entities in Missouri, and the Bondholders' cause of action arises from these misrepresentations.  The relevant section of the Missouri long-arm statute has been interpreted to include "[e]xtraterritorial acts that produce consequences in the state, such as fraud."  *Bryant v.*

*Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 232 (Mo. 2010) (quotation omitted);

*accord Myers*, 689 F.3d at 910. In *Myers*, the Eighth Circuit explained that:

> [*F*]*oreseeability* is the standard to be applied when evaluating whether
> jurisdiction is appropriate over a tortious act occurring in another state with
> actionable consequences in Missouri. If a defendant can reasonably foresee
> his or her negligent actions having consequences felt in Missouri,
> jurisdiction is authorized.

*Myers*, 689 F.3d at 910-11. In opposing Perkins Coie's motion to dismiss for lack of

personal jurisdiction, Morgan Keegan has the burden of making a prima facie showing

that Perkins Coie in fact committed a tortious act in Missouri. *See, e.g.*, *Peabody*

*Holding Co., Inc. v. Costain Grp. PLC*, 808 F. Supp. 1425, 1433 (E.D. Mo. 1992)

("Because the jurisdictional facts, where jurisdiction is based upon a single tort, are

identical to the merits of the claim, plaintiffs must make a prima facie showing that

defendant has in fact committed the tort alleged in the complaint." (quotation omitted)).

The essential elements of a claim for fraudulent misrepresentation include "the

speaker's intent that it should be acted on by the person in the manner reasonably

contemplated; . . . the hearer's reliance on the representation being true; [and] the

hearer's right to rely thereon." *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322

S.W.3d 112, 131-32 (Mo. 2010). A claim for negligent misrepresentation requires a

showing that the speaker provided information "for the guidance of limited persons in a

particular business transaction; [and] the hearer justifiably relied on the information." *Id.*

at 134. Thus, [b]oth fraudulent and negligent misrepresentation claims require that the

misrepresentation be material and reasonably relied upon by the plaintiff." *Kesselring v.*

*St. Louis Grp., Inc.*, 74 S.W.3d 809, 814-15 (Mo. Ct. App. 2002). In addition, to satisfy

Missouri's long-arm statute, the misrepresentation must have been received and relied upon by a party in Missouri. *See Bryant*, 310 S.W.3d at 232.

Though the elements of liability for fraudulent or negligent misrepresentation partially overlap, these are two distinct claims that differ in important respects. Unlike fraud, which involves an element of intent to deceive, negligent misrepresentation "is premised on the theory that the speaker believed the information supplied was correct but was negligent in so believing." *Renaissance Leasing, LLC*, 322 S.W.3d at 134. In other words, fraudulent misrepresentation is predicated on a breach of the duty of honesty, while negligent misrepresentation involves a breach of the duty of care. Restatement (Second) of Torts § 552 cmt. a (1977). Whereas every supplier of commercial information may reasonably be expected not to provide information it knows to be false, the occasions in which the duty of care arises must be more limited, due to the ease with which information "may be, and may be expected to be, circulated." *Id.* As a result, liability for negligent misrepresentation arises only in instances where the speaker "was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose." *Id.*

With respect to liability for indirect recipients of the speaker's representation, liability for negligent misrepresentation is also somewhat narrower than for fraudulent misrepresentation. To be liable to indirect recipients of a fraudulent statement, the speaker must have had the intent, or "some reason to expect," that the statement would be repeated to others and would influence their conduct. Restatement (Second) of Torts § 533; *accord Wagner v. Mortgage Info. Servs., Inc.*, 261 S.W.3d 625, 640 (Mo. Ct. App.

2008).  By contrast, liability for negligent misrepresentation extends only to "a limited group of persons for whose benefit and guidance [the speaker] intends to supply the information or knows that the recipient intends to supply it."  Restatement (Second) of Torts § 552.

It is not entirely clear from Morgan Keegan's Third-Party Complaint or briefing on this motion what fraudulent or negligent misrepresentations Perkins Coie is alleged to have made and to whom.  With respect to the subject matter of the misrepresentations, Morgan Keegan's claims appear to be premised on the allegation that Wise:  1) "provided an analysis of" Mamtek's sales contract with the Chinese company Xibo Pharmaceutical Group; and 2) made representations that "he had personally observed Mamtek's manufacturing facility in China."  [Docs. ## 155 at 4; 235 at 16]; *see also* [Doc. # 235 at 23-24].[2]  In turn, Morgan Keegan claims to have reasonably relied on these representations in "completing its due diligence and assisting in the preparation of the [] Official Statement."  [Doc. # 155 at 4]; *see also* [Doc. # 235 at 17-18 ("Morgan Keegan has alleged that [Perkins Coie's] communications contained fraudulent or negligent misrepresentations, which were reasonably relied upon by the City . . . and Morgan Keegan, as bond underwriter. . . . This information [] was later conveyed . . . to the public through the . . . Official Statement and, furthermore, forms the very basis for [the Bondholders'] cause of action in this case.").  As the Bondholders allege that the Chinese

---

[2] To the extent that Morgan Keegan suggests in its opposition brief that Perkins Coie misrepresented the value of the security pledged by Mamtek, this is not alleged in Morgan Keegan's Third-Party Complaint.  Furthermore, as discussed above, the evidence and pleadings do not support such a claim and, in fact, show that Perkins Coie was not asked and did not attempt to provide an opinion as to the value of the security.

sales contract was fraudulent, [Doc. # 66-1 at 15-16, 19-20], and that Mamtek never had

an operational sucralose factory in China, [Doc. # 66-1 at 7, 14, 16-17], Morgan Keegan

maintains that the Bondholders' claims, and thereby its claims for indemnity and

contribution, arise from Perkins Coie's fraudulent or negligent misrepresentations.

Tested by the exhibits and affidavits submitted in connection with this motion,

however, Morgan Keegan has not made a prima facie showing that its claims for

indemnity or contribution could arise from any negligent or fraudulent misrepresentation

made by Perkins Coie. The only evidence of any representation made by Perkins Coie

concerning the sales contract is a June 7, 2010 letter from Wise to Tom Cunningham of

CVR. A review of this letter directly contradicts Morgan Keegan's allegation that

Perkins Coie made any representation concerning the sales contract that relates to the

present case. In this letter, Wise wrote:

> We [Perkins Coie] confirmed with our local counsel in the People's
> Republic of China ("PRC") regarding the form of the attached sales
> agreement under the PRC laws. . . . In accordance with Article 12, Article
> 32 and Article 131 of the PRC Contract Law regarding conclusion of
> contracts, this agreement meets with the formation requirement. This kind
> of agreement can be seen in the PRC business community. This letter is
> presented to address *only* whether the form of the sales agreement is a form
> of a document that one would see in China. This letter is *not* intended to be
> a verification of the authenticity of the document, or conforming the
> Chinese and English. This letter is not intended to serve as an Opinion of
> Counsel Letter, and no third party may rely on this letter.

[Doc. # 213 at 9]. Thus, not only did Wise explicitly disclaim any intent for third-parties,

such as Morgan Keegan or the Bondholders, to rely on the representations in this letter,

but his opinion was confined solely to whether the sales contract was of a form that

would be recognizable in China.

Neither Morgan Keegan nor the Bondholders have alleged that this contract was not drafted in a form that would be recognized in China. Rather, the Bondholders allege that the actual subject matter of the contract, specifically Xibo's promise to purchase Mamtek manufactured sucralose, was fraudulent. Yet, Wise's letter unambiguously stated that the authenticity of the contract was beyond the scope of Perkins Coie's review of this document. Accordingly, Morgan Keegan has failed to present a prima facie case that its claims, or those of the Bondholders, arise from any misrepresentation made by Perkins Coie concerning the sales contract.

With respect to the Mamtek facility in China, Morgan Keegan relies primarily on another letter from Wise to Cunningham regarding the actions Wise took with respect to the Mamtek materials placed in escrow in connection with the bond issue. *See* [Doc. # 235 at 16, 23-24]. In this letter, Wise wrote:

> In the summer of 2009, I was asked by Bruce Cole, CEO of Mamtek, to visit Mamtek's operating facilities related to the production of sucralose located in Wuyishan, China. I was tasked with attempting to collect materials sufficient to operate and/or reproduce the facility in the event the facility was damaged or the operating materials were lost or destroyed. In this regard, I was provided with a copy of the blueprints identified in Section 8 of Schedule 1 [of the Escrow Agreement]. My former partner Zoe Wang and I personally visited the facility and interviewed a Mamtek engineer and an inventor, Mr. Zhenghao Wan, over the course of two days. The engineer and Mr. Wan verified to me that the 60 ton sucralose line as constructed was substantially in accordance with those blueprints and that the processes used in the 60 ton sucralose line were substantially in accordance with the processes reflected in the patent applications filed by Perkins Coie on Mamtek's behalf.

Emphasizing Wise's statement that he had personally visited the Mamtek factory in China, Morgan Keegan argues that Perkins Coie negligently or fraudulently misrepresented the existence of this facility.

Viewed in context, however, it is clear that Wise did not intend or expect any party to rely, and no party could have justifiably relied, on this letter as a representation that Mamtek in fact had a fully operational sucralose factory in China. First, Wise's stated purpose for the visit was only to collect materials sufficient to duplicate the facility he visited; Wise did not claim to have visited the facility in order to verify that it was operational and actually producing sucralose. The Bondholders allege only that the facility never became operational, due in part to environmental concerns; they do not allege that the plant never existed or that it was incapable of producing sucralose. *See* [Doc. # 66-1 at 6] ("Mamtek International received approval from the local authorities to build a sucralose plant in Wuyishan City, and completed construction of the plant in 2008. The facility never opened, however, due in part to environmental concerns raised by the Chinese conservation department. Mamtek subsequently ended operations in China without ever having produced sucralose."). The fact that Wise claimed to have visited a facility in China that Mamtek held out to be a sucralose factory is not a representation that Wise personally verified that the facility was, in fact, operational and producing sucralose.

Furthermore, even assuming it is possible to read between the lines of Wise's letter and find that he implicitly represented that the factory was operational, the unambiguous disclaimers in Wise's letter show that he did not intend for any party to

rely, and no party could have justifiably relied, upon this representation. Immediately

after recounting his visit to the facility in China, Wise cautioned, "At all times during my

review, I have relied on the representations by Mamtek," [Doc. # 213 at 14], which

clearly encompassed the representations of the Mamtek personnel Wise met with in

China. To foreclose all doubt, Wise also included the following advisement at the

conclusion of his letter:

> In assembling the above-information, I have at all times relied upon the
> representations of Mamtek and have not independently verified the
> accuracy of the information contained herein or in the materials identified
> in Schedule 1. I have not undertaken, nor was I obligated or expected to
> undertake, and independent investigation to determine the accuracy of the
> facts or other information, and any inquiry undertaken by me during the
> preparation of this letter or compilation of the materials identified in
> Schedule 1 should not be regarded as such an investigation. I have outlined
> certain actions I have taken on behalf of Mamtek in this letter. These
> actions and this letter were done for Mamtek's benefit only, and neither my
> actions nor any statements in this letter may be used or relied on for any
> other purpose or by any other person.

[Doc. # 313 at 15]. In light of this clear disclaimer, it is evident that Wise neither

intended nor expected any recipient of this letter, direct or indirect, to rely upon it.

Furthermore, Morgan Keegan's purported reliance on Wise's representation could not

have been justified due to Wise's clear disclaimer. *See, e.g.*, *Mark Twain Kansas City*

*Bank v. Jackson, Brouillette, Pohl & Kirley, P.C.*, 912 S.W.2d 536, 540 (Mo. Ct. App.

1995) (holding that the plaintiff could not have justifiably relied upon an attorney opinion

letter that "contained the following language in the last sentence: 'we take no

responsibilities to any information or opinions contained herein.' ").

To the extent that Morgan Keegan claims to have relied on representations about Wise's visit to China made by third-parties that were unaffiliated with Perkins Coie, and which may have omitted Wise's disclaimer, these third-party statements cannot fairly be attributed to Perkins Coie. Such an omission would have fundamentally altered Wise's statement and Morgan Keegan has presented no basis for imputing such a significant omission to Wise. As this Court previously found in ruling on Armstrong Teasdale's motion for partial summary judgment, "it would be illogical for a jury" to find reasonable reliance in such circumstances. [Doc. # 170 at 9-10]. Similarly, Morgan Keegan's reference to statements made by Mamtek's COO, Reena Gordon, concerning what Wise could or would attest to has no bearing on Perkins Coie's potential liability. *See Roth v. La Societe Anonyme Turbomeca France*, 120 S.W.3d 764, 776 (Mo. Ct. App. 2003) (refusing to impute a client's misrepresentations to its attorney, because "[a]lthough an attorney is an agent of his or her client and acts as the client's alter ego, the converse is not true." (citing *Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co., Inc.*, 931 S.W.2d 166, 176 (Mo. Ct. App. 1996) ("[T]he client's misconduct cannot be imputed to the attorney.")).

Finally, Morgan Keegan's reliance on the testimony of Mark Boatman of Armstrong Teasdale is deficient in the same respect. Boatman did testify that someone from Perkins Coie, apparently Wise, had told Armstrong Teasdale "that he had visited [the China facility] and it was manufacturing." [Doc. # 235-6 at 2]. The excerpted deposition testimony provides no further details or context, so it is not clear whether or not Wise qualified his statement to Armstrong Teasdale with a disclaimer of the type

included in his letter to CVR.  Considering that every piece of evidence in the record in which Wise made a representation about Mamtek included such a disclaimer, it seems at best unlikely that he did not.  Nonetheless, even assuming that Armstrong Teasdale at some point conveyed such an unqualified statement to Morgan Keegan, there is still no basis for finding that Wise intended or expected for any party to rely, or that Morgan Keegan could have justifiably relied, on this statement.  Regardless of what Morgan Keegan claims to have heard from a third-party, this does not change the fact that Morgan Keegan also claims to have relied on Wise's letter to CVR.  *See* [Doc. # 235 at 23-24]. To the extent that Morgan Keegan claims to have relied on Armstrong Teasdale's recitation of Wise's representation about the facility in China to the exclusion of Wise's explicit disclaimer in the letter to CVR, this reliance could not have been justified.  *See Hamra v. Magna Grp., Inc.*, 956 S.W.2d 934, 940 (Mo. Ct. App. 1997) ("[The law] is not an indulgent guardian which can go to romantic length of giving protection against consequences of indolence, folly or careless indifference to ordinary and accessible means of information.").

In sum, Morgan Keegan has failed to make a prima facie showing that Perkins Coie made a fraudulent or negligent representation in Missouri.  As this is Morgan Keegan's sole basis for invoking the provision of Missouri's long-arm statute that confers jurisdiction over tortious acts committed in Missouri, this provision does not permit the exercise of personal jurisdiction in this case.

B.    **General Jurisdiction**

Morgan Keegan alternatively argues that Perkins Coie is subject to general jurisdiction based on its contacts with Missouri. As with specific jurisdiction, "general jurisdiction can only be asserted insofar as it is authorized by state law and permitted by the Due Process Clause." *Viasystems, Inc.*, 646 F.3d at 595. However, "[b]ecause it extends to causes of action unrelated to the defendant's contacts with the forum state, general jurisdiction over a defendant is subject to a higher due-process threshold." *Id.* In this case, it is not necessary to consider whether Missouri law permits subjecting Perkins Coie to general jurisdiction, because the high bar posed by the Due Process Clause precludes the exercise of general jurisdiction. *See id.*

The test for asserting general jurisdiction over foreign businesses under the Due Process Clause is whether they have developed "continuous and systematic general business contacts, . . . , with the forum state, [so] as to render them essentially at home in the forum State." *Id.* (quotations and citation omitted). In this case, Perkins Coie's minimal, sporadic contacts with Missouri are insufficient to render it essentially at home in Missouri. Perkins Coie does not have any offices or own any real estate in Missouri, and it is not registered to do business in Missouri. [Doc. # 213 at 6]. Perkins Coie also does not maintain an address, telephone number, or bank account in Missouri, and does not employ any individuals in Missouri. [Doc. # 213 at 6]. While there is evidence that Perkins Coie sometimes communicates with parties in Missouri, the Eighth Circuit has held, specifically with respect to jurisdiction over attorneys, that "[c]ontact by phone or mail is insufficient to justify [the] exercise of personal jurisdiction." *Porter v. Berall*, 293 F.3d 1073, 1076 (8th Cir. 2002).

Furthermore, of the approximately 800 Perkins Coie attorneys located around the world, [Doc. # 251-1 at 6], only four have an active Missouri bar license, [Doc. # 247-2 at 6]. Of these four attorneys, only one has entered an appearance in any of the twenty Missouri court cases in which a Perkins Coie attorney appeared between 2003 and 2013. *See* [Doc. # 247-2 at 3-5]. This attorney appeared in only three of these cases, meaning that in seventeen of these cases Perkins Coie attorneys appeared *pro hac vice*. These limited and primarily *pro hac vice* appearances in Missouri do not suggest that a law firm with such an extensive national and international practice as Perkins Coie is essentially at home in Missouri. *See, e.g.*, *Wolk v. Teledyne Indus., Inc.*, 475 F. Supp. 2d 491, 502 (E.D. Pa. 2007) ("[A]n attorney's *pro hac vice* appearance in an unrelated matter in the forum fails to establish general personal jurisdiction."); *accord Di Loreto v. Costigan*, 600 F. Supp. 2d 671, 692 (E.D. Pa. 2009) ("Repeatedly, courts have found that an attorney's entry of a court appearance *pro hac vice* in the forum state, without more, is not a substantial enough contact to permit that court to exercise jurisdiction over his person.' " (quotation omitted)), *aff'd*, 351 F. App'x 747 (3d Cir. 2009).

Citing basic principles of partnership law, Morgan Keegan argues that general jurisdiction exists because two Perkins Coie partners maintain active Missouri bar licenses. Morgan Keegan has not presented any authority, however, that suggests a partner's bar license, standing alone, subjects the entire partnership to general jurisdiction in the licensing state. The primary case on which Morgan Keegan relies ruled only that "the activities of the partner are generally attributed to the partnership and jurisdiction over the partnership follows *from the partner's contacts, if sufficient*, regardless of the

absence of independent contacts between the partnership *qua* entity and the forum." *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 466 (1st Cir. 1990) (first emphasis added).

This rule in no way suggests that a partnership is subject to general jurisdiction in every state in which one of its partners holds a professional license. At most, it supports the proposition that where a partner is subject to *specific* jurisdiction in the forum state, specific jurisdiction also exists with respect to the partnership. Holding a Missouri bar license and using it to practice law in Missouri would almost certainly subject these Perkins Coie attorneys to specific jurisdiction for matters arising from these Missouri contacts. Depending on the circumstances, this may also justify exercising specific jurisdiction over Perkins Coie. *See Donatelli*, 893 F.2d at 467 ("[T]he actions of a partner within the scope of a general partnership's purposes necessarily become the actions of the partnership. . . . For this reason, any forum able to exercise personal jurisdiction over the partner *by reason of those activities* must also be able to exercise jurisdiction over the partnership."). However, the present case is not related in any manner to the Missouri bar licensed partners' contacts with Missouri. Absent some authority, this Court cannot accept the sweeping proposition that every legal partnership is subject to general jurisdiction in any state in which one of its partners happens to have an active bar membership.

Morgan Keegan alternatively claims that general jurisdiction exists due to Perkins Coie's substantial Missouri client base and the revenue it derives from these clients. While Perkins Coie does have some clients with Missouri billing addresses, Perkins

25

Coie's Missouri clients constitute a negligible portion of Perkins Coie's overall business. Perkins Coie produced files for 167 clients with a Missouri billing address between 2003 and 2013, and approximately seventy-five of these client accounts are currently active. [Doc. # 247-2 at 7]. From 2003 to 2013, Perkins Coie received annual attorney's fees from these clients ranging from $700,000.00 to $5,077,472.00. [Doc. # 247-2 at 9]. In terms of Perkins Coie's gross revenue, however, these are nominal amounts. In 2012, for example, the $4,243,178.00 in attorney's fees that Perkins Coie billed to Missouri clients constituted only seven-tenths of one percent (.00698%) of the firm's gross revenue. *See* [Docs. ## 247-2 at 9; 251-1 at 4]. Morgan Keegan has not cited any authority that suggests the receipt of such a negligible amount of income from residents of a state is sufficient to render a law firm essentially at home in that state.

Furthermore, of these clients, a select few accounted for the bulk of the revenue Perkins Coie derived from clients with Missouri billing addresses. For instance, only seven of the 167 Missouri clients generated total revenue that exceeded one million dollars between 2003 and 2013, and these clients accounted for approximately seventy-percent of Perkins Coie's total revenue from Missouri clients during this period. *See* [Doc. # 247-2 at 17-20]. By contrast, forty-seven of these clients generated no revenue at all, nine generated total revenue that did not exceed one-thousand dollars, and another forty-one generated total revenue that did not exceed ten-thousand dollars during this eleven-year period. *See* [Doc. # 247-2 at 17-20]. As Perkins Coie has had only fleeting and minimal contacts with the majority of its Missouri clients, there is little support for Morgan Keegan's allegation that Perkins Coie has a substantial Missouri client base.

Furthermore, considering that Perkins Coie has no offices or employees in Missouri and its attorneys have only sporadically appeared in Missouri courts, it appears that the bulk of this work was performed out-of-state. Morgan Keegan cites no authority that suggests the performance of limited, out-of-state legal services for a resident of the forum state is sufficient to give rise to general jurisdiction, and Eighth Circuit precedent strongly suggests that it is not. *See Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 227 (8th Cir. 1987) (affirming dismissal for lack of personal jurisdiction, despite the existence of an attorney-client relationship between the plaintiff—a citizen of South Dakota—and the foreign law firm, because the firm's "only 'substantial connection' with South Dakota was its representation of a South Dakota corporation in connection with litigation taking place wholly outside South Dakota.").

Finally, Morgan Keegan significantly overstates the evidence that Perkins Coie actively solicits business in Missouri. In response to Morgan Keegan's discovery requests, Perkins Coie indicated that, since 2008, it has responded to twelve requests for proposal from current or prospective clients in Missouri. Merely responding to a request from a Missouri resident, as opposed to actively soliciting clients, does not support a finding that Perkins Coie has purposefully availed itself of doing business in Missouri. *See Austad*, 823 F.2d at 226. Similarly, the fact that an "advanced search" of Perkins Coie's website returns results that describe some contacts between Perkins Coie and Missouri, see [Doc. # 247-3], cannot be viewed as directly soliciting business from Missouri residents. Finally, the fact that Perkins Coie agents have occasionally travelled to destinations in Missouri for the purpose of "business development," [Doc. # 247-2 at

11-12], is not sufficient to meet the high threshold required for the exercise of general jurisdiction. Considering the minimal amount of business actually generated by Missouri clients, these sporadic visits do not render Perkins Coie essentially at home in Missouri.

In sum, the evidence presented by Morgan Keegan does not show that Perkins Coie maintains the kind of continuous and systematic business contacts with Missouri that are necessary to permit the exercise of general jurisdiction.

## IV.    Conclusion

For the foregoing reasons, Third-Party Defendant Perkins Coie, LLP's motion to dismiss the Third-Party Complaint of Morgan Keegan & Co., Inc. for lack of personal jurisdiction, [Doc. # 209], is GRANTED. Morgan Keegan's claims against the Perkins Coie are DISMISSED, without prejudice.

s/ NANETTE K. LAUGHREY
NANETTE K. LAUGHREY
United States District Judge

Dated: April 8, 2014
Jefferson City, Missouri