JOHN W. CROMEANS., JR., et al.,    )
         )
      Plaintiffs,    )
         )
    v.    )    No. 2:12-CV-04269-NKL
         )
MORGAN KEEGAN & CO., INC., et al.,    )
         )
      Defendants/Third-Party    )
      Plaintiff,    )
         )
    v.    )
         )
CUNNINGHAM, VOGEL & ROST, P.C.,    )
et al.,    )
         )
      Third-Party Defendants.    )

## ORDER

Pending before the Court are Third-Party Defendant Cunningham, Vogel & Rost, P.C. ("CVR")'s motion to dismiss the Third-Party Complaint of Morgan Keegan & Company, Inc. ("Morgan Keegan"), [Doc. # 194], and Morgan Keegan's motion for leave to file an Amended Third-Party Complaint against CVR, [Doc. # 351].  For the reasons set forth below, CVR's motion to dismiss is GRANTED, and Morgan Keegan's motion for leave to amend is DENIED, as futile.

## I.    Background

On July 15, 2010, the City of Moberly, Missouri ("Moberly") approved the issuance of $39 million in municipal bonds by the Industrial Development Authority of

the City of Moberly ("the Authority").  The bonds were issued by the Authority to finance a project that included acquiring and improving a 33 acre parcel of land, as well as constructing and equipping a sucralose manufacturing and processing facility, all located within Moberly.  CVR served as counsel to both Moberly and the Authority in connection with the bond issue, and Morgan Keegan served as the underwriter for the bonds.  Approximately 140 persons or entities purchased the bonds.  Mamtek failed, however, and the bonds are now alleged to be worthless.

This putative class action was filed on behalf of the bond purchasers (collectively, "the Bondholders") against Morgan Keegan, among others.  The claims of the putative class are based, in substantial part, on alleged material misrepresentations and omissions contained in the Official Offering Statement published in connection with the sale of the bonds.  The putative class alleges that Morgan Keegan, as underwriter, prepared and distributed the Official Statement and had a duty to conduct a due diligence investigation as to the accuracy of its contents.  Morgan Keegan subsequently filed a Third-Party Complaint against CVR, seeking indemnity and contribution from CVR in the event that Morgan Keegan is found liable to the Bondholders for any misrepresentations in the Official Statement.

On March 11, 2014, the Court heard oral argument on CVR's motion to dismiss and ordered the parties to submit supplemental briefing.  On April 9, 2014, Morgan Keegan moved for leave to file an Amended Third-Party Complaint, and attached its proposed pleading.  CVR opposes the amendment on the ground that the proposed

Amended Third-Party Complaint does not cure the deficiencies in Morgan Keegan's claims and thus the motion to amend should be denied as futile.

## II.    Discussion

The primary, and ultimately dispositive, question presented on CVR's motion to dismiss is whether Morgan Keegan has plausibly alleged that CVR is liable directly to the Bondholders for the conduct that is the basis of Morgan Keegan's claims for indemnity and contribution.  While there is some dispute as to whether CVR's alleged liability to the Bondholders must be identical to Morgan Keegan's, there is no question that Morgan Keegan's claims for indemnity and contribution require some showing that CVR is originally liable to the Bondholders.  *See, e.g.*, *Travelers Prop. Cas. Co. of Am. v. Manitowoc Co., Inc.*, 389 S.W.3d 174, 179 (Mo. 2013) ("[T]o maintain an action for contribution, . . . both the party seeking contribution and the defendant against whom contribution is sought must be . . . tortfeasor[s], originally liable to the plaintiff-injured party." (quotation omitted)); *Missouri Pac. R.R. Co. v. Whitehead & Kales Co.*, 566 S.W.2d 466, 468 (Mo. 1978) ("[T]he right to [] indemnity presupposes actionable negligence of both parties toward a third party."); *Hance v. Altom*, 326 S.W.3d 133, 136 (Mo. Ct. App. 2010) ("A prerequisite for a contribution claim to be valid is that both the party seeking contribution and the defendant against whom contribution is sought must be tort-feasors that are originally liable to the plaintiff.").

CVR argues that Morgan Keegan's Third-Party Complaint must be dismissed, and its motion for leave to file an Amended Third-Party Complaint must be denied, because Morgan Keegan does not, and cannot, allege that CVR is liable directly to the

Bondholders. In response, Morgan Keegan has been less than clear as to the basis of CVR's purported liability to the Bondholders. Although Morgan Keegan argues in its opposition brief that it "alleges that CVR is liable for the [Bondholders'] purported damages throughout its pleading," Morgan Keegan supports this statement with a string of quotations from its Third-Party Complaint that simply state that CVR is liable to the Bondholders. [Doc. # 227 at 13]. These bare legal conclusions, however, are neither entitled to the presumption of truth nor sufficient to withstand CVR's motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Nonetheless, considering all of its submissions on this issue and giving Morgan Keegan the benefit of the doubt, it appears that Morgan Keegan is claiming that CVR is liable to the Bondholders for misrepresentations, express or by omission, that CVR allegedly made to Morgan Keegan. *E.g.*, [Docs. ## 156 at 6-10; 227 at 6, 10, 16-17; 333 at 4-6]. Morgan Keegan has also argued that CVR owed a general duty to the Bondholders to see that the Official Statement contained accurate information. *E.g.*, [Docs. ## 156 at 8, 10; 227 at 12]. The latter claim is made most explicitly, and figures prominently, in Morgan Keegan's proposed Amended Third-Party Complaint. *E.g.*, [Doc. # 351-1 at 9]. Each of these theories is addressed, in turn, below.

## A.      Misrepresentation

Morgan Keegan's claims for contribution and indemnity are based, in substantial part, on the allegation that CVR negligently or intentionally provided Morgan Keegan with the same information that was ultimately included in the Official Statement and now forms the basis of the Bondholders' claims. *See, e.g.*, [Docs. ## 156 at 8; 351-1 at 11-

12]. By alleging that CVR negligently or intentionally provided false information, Morgan Keegan appears to premise its claims on both negligent and fraudulent misrepresentation. These are two distinct causes of action that require proof of different elements, *see, e.g.*, *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 131-32, 134 (Mo. 2010), and thus must be addressed separately.

### 1. Negligent Misrepresentation

To state a claim for negligent misrepresentation, the plaintiff must allege that:

> (1) the speaker supplied information in the course of his business; (2) because of the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of limited persons in a particular business transaction; (4) the hearer justifiably relied on the information; and (5) due to the hearer's reliance on the information, the hearer suffered a pecuniary loss.

*Renaissance Leasing, LLC*, 322 S.W.3d at 134. Although liability can extend to indirect recipients of a negligent misrepresentation, such as the Bondholders in the context of Morgan Keegan's claims against CVR, Missouri courts limit this liability "to the 'narrow confines' of § 552 of the Restatement (Second) of Torts." *MidAmerican Bank & Trust Co. v. Harrison*, 851 S.W.2d 563, 564 (Mo. Ct. App. 1993) (quoting *Mark Twain Plaza Bank v. Lowell H. Listrom & Co., Inc.*, 714 S.W.2d 859, 865 (Mo. Ct. App. 1986)).

Under this section, liability does not extend "to every person who ultimately may be aware of the misstatement," *Chubb Grp. of Ins. Cos. v. C.F. Murphy & Assocs., Inc.*, 656 S.W.2d 766, 784 (Mo. Ct. App. 1983), or even "to every reasonably foreseeable consumer of financial information," *MidAmerican Bank & Trust Co.*, 851 S.W.2d at 565. Rather, section 552 limits liability to losses suffered:

(a) by the person or one of a limited group of persons for whose benefit and guidance [the speaker] intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that [the speaker] intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552(2) (1977).

Morgan Keegan's Third-Party Complaint and proposed Amended Third-Party Complaint never specifically allege that CVR supplied information with the knowledge or intent that it would be provided to the prospective bond purchasers and influence their investment decision. The closest Morgan Keegan's pleadings come to such an allegation is the bare assertion that CVR "was aware that Morgan Keegan, as the bond underwriter, would rely on the investigations and representations of the City, . . . the Authority, CV&R and others as Morgan Keegan fulfilled its responsibilities as underwriter." [Doc. # 351-1]. To the extent that this conclusory allegation can be construed as claiming that CVR knew Morgan Keegan intended to supply the information it received from CVR directly to the Bondholders to guide their purchase decision, it is, in the context of Morgan Keegan's other allegations, insufficient to state a plausible claim.

The only specific representation made by CVR identified in either Morgan Keegan's original Third-Party Complaint or proposed Amended Third-Party Complaint is an e-mail dated May 20, 2010 from Tom Cunningham of CVR to Reena Gordon, Mamtek's COO.[1] *See* [Docs. ## 156 at 6; 196-1 at 1; 351-1 at 10]. In this e-mail,

---

[1] Because this correspondence is specifically described in Morgan Keegan's Third-Party Complaint and, as the only specific misrepresentation identified therein, is central to Morgan

Cunningham wrote to inform Gordon that representatives from Morgan Keegan would be contacting her "to initiate their due diligence process . . . and to assure that [Cunningham had] correctly conveyed the sum and substance of [Mamtek] in the context of describing the proposed funding."  [Doc. # 196-1 at 1].

It is apparent from this e-mail that CVR did not know that Morgan Keegan would simply relay CVR's representations about Mamtek to the Bondholders.  Rather, it is clear that CVR understood Morgan Keegan was conducting its own due diligence review of Mamtek that involved independently verifying any representations CVR had made about Mamtek at the start of this process.  This is consistent with Morgan Keegan's allegation that it "undertook its own due diligence review of Mamtek."  [Docs. ## 156 at 6; 351-1 at 9].  The fact that this e-mail does not support the proposition that CVR knew the information it supplied to Morgan Keegan would be relayed to the Bondholders and influence their purchase decision is particularly significant, considering that Morgan Keegan's pleadings do not contain any other well-pled factual allegations that might warrant a contrary finding.

Morgan Keegan's remaining allegations fail to show, and are in fact inconsistent with, a claim that CVR is liable to the Bondholders for negligent misrepresentation.  In particular, Morgan Keegan alleges that CVR served as counsel to Moberly, the Authority and the Moberly Area Economic Development Corporation ("EDC"), as well as financial

---

Keegan's claims, the Court may consider this document without converting CVR's motion to dismiss to a motion for summary judgment.  *See McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." (quotation omitted)).

advisor to Moberly, and that CVR acted as an agent of these entities at all relevant times. [Docs. ## 156 at 2; 351-1 at 2].  Morgan Keegan then alleges that "the Authority was making an independent analysis of the pros and cons of the proposed transaction," which CVR undertook "on behalf of the Authority."  [Doc. # 351-1 at 4-5]; *see also* [Doc. # 156 at 4].  Morgan Keegan also alleges that CVR received information that it shared "with the City, the EDC and the Authority," but not Morgan Keegan.  [Doc. # 351-1 at 6].  Finally, Morgan Keegan alleges that CVR conducted an independent investigation of Mamtek and sought various assurances from Mamtek's intellectual property counsel without informing Morgan Keegan of these efforts and "provided some (though not all) information from [its investigation of Mamtek] to Morgan Keegan."  [Doc. # 351-1 at 6-7, 8]; *see also* [Doc. # 156 at 6].

These allegations belie any inference that CVR undertook the efforts described above with the knowledge or intent that the results would be supplied directly, and without further verification, to prospective bond purchasers to guide their purchase decision.  Morgan Keegan specifically alleges that CVR undertook its independent analysis of Mamtek on behalf of its client, the Authority, and provided the information it obtained to its clients.  There is simply no basis for inferring that CVR, in performing an investigation and seeking various assurances on behalf of its clients as described in Morgan Keegan's pleadings, had any purpose other than protecting the interests of its clients, let alone knowledge or intent that the results of an investigation it performed for the benefit of its clients would be given to and relied upon by the bond purchasers.  To the extent that Morgan Keegan's allegations suggest that CVR could have reasonably

foreseen that the information it provided would be used in this manner, this is insufficient to expose CVR to liability to the Bondholders for negligent misrepresentation. *See, e.g.*, *MidAmerican Bank & Trust Co.*, 851 S.W.2d at 565. Absent any allegation that CVR knew the information would be relayed to the Bondholders and influence their purchase decision, Morgan Keegan has failed to allege that CVR is liable to the Bondholders under a theory of negligent misrepresentation.

Rather than addressing CVR's relationship to the Bondholders, Morgan Keegan's allegations and arguments focus on its purported reliance on CVR's representations in fulfilling its responsibilities as underwriter. *E.g.*, [Docs. ## 156 at 7; 351-1 at 10; 227 at 16-17]. While this may or may not be relevant in the context of a direct claim by Morgan Keegan against CVR, it fails to establish the connection between CVR and the Bondholders that is necessary for Morgan Keegan to state a claim for indemnity or contribution. Although Morgan Keegan alleges that it relied on CVR's representations and, as a result, communicated information provided by CVR to the Bondholders, this reflects an independent decision on the part of Morgan Keegan. In other words, the allegation that Morgan Keegan elected to convey information provided by CVR to the prospective bond purchasers is not the same as an allegation that CVR knew Morgan Keegan would relay this information to this class of individuals to guide them in this transaction. Consequently, regardless of whether Morgan Keegan's allegations would support an actionable, direct claim by Morgan Keegan against CVR, Morgan Keegan has failed to state a claim for contribution or indemnity based on CVR's allegedly negligent misrepresentations.

## 2.    *Fraudulent Misrepresentation*

Morgan Keegan alternatively alleges that CVR intentionally provided the same inaccurate information to Morgan Keegan that is now the basis for the Bondholders' claims.  Morgan Keegan thus appears to claim that CVR is liable to the Bondholders for fraudulent misrepresentation.

> The elements of fraudulent misrepresentation are:  (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury.

*Renaissance Leasing, LLC*, 322 S.W.3d at 131-32.  Liability to indirect recipients of a fraudulent misrepresentation is less restricted than in cases involving mere negligence, due to the heightened culpability that arises from the speaker's requisite intent to deceive.  *See Mark Twain Plaza Bank*, 714 S.W.2d at 865; Restatement (Second) of Torts § 552 cmt. a.  In this context, Missouri courts have adopted and applied the rule as stated in the Restatement (Second) of Torts § 533.  *Wagner v. Mortg. Info. Servs., Inc.*, 261 S.W.3d 625, 640 (Mo. Ct. App. 2008); *Freeman v. Myers*, 774 S.W.2d 892, 894 (Mo. Ct. App. 1989).  Under this section, a speaker may be liable to indirect recipients of a fraudulent misrepresentation if the speaker "intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved."  Restatement (Second) of Torts § 533.

Although fraudulent misrepresentation is less demanding with respect to the speaker's state of mind as to indirect recipients of the representation, it is also a fraud

claim and therefore subject to the heightened pleading standards of Rule 9(b). *Freitas v. Wells Fargo Home Mortgage, Inc.*, 703 F.3d 436, 439 (8th Cir. 2013). Consequently, to state a claim for fraudulent misrepresentation, "[t]he plaintiff must plead such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Id.* (quotation omitted). Put differently, "Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how," of the alleged fraud. *Id.* (quotation omitted).

The only specific representation made by CVR identified in Morgan Keegan's pleadings is the May 20, 2010 e-mail from Tom Cunningham of CVR to Mamtek's COO. However, for the same reasons discussed above, this e-mail does not support, and in fact is contrary to, the proposition that CVR had some reason to expect that the information it provided to Morgan Keegan would be relayed directly to the bond purchasers and guide their investment decision. Rather, this e-mail shows that CVR believed Morgan Keegan was conducting its own due diligence review that involved verifying the accuracy of what CVR had previously conveyed. Consequently, there is no basis for concluding from this e-mail that CVR may be liable to the Bondholders for fraudulent misrepresentation.

Morgan Keegan otherwise fails to identify any specific representations made by CVR, and instead relies on broad allegations that CVR investigated Mamtek and "provided some (though not all) information from those investigations to Morgan Keegan." [Doc. # 351-1 at 8]; *see also* [Doc. # 156 at 6] ("CV&R undertook investigations . . . and . . . provided some information from those investigations to

11

Morgan Keegan.").  These vague statements do not identify the what, when, where and how of the alleged fraud, and thus fail state a claim under Rule 9(b).

Finally, Morgan Keegan's proposed Amended Third-Party Complaint is decidedly more centered on allegations that CVR failed to disclose to Morgan Keegan information it acquired through the course of its investigation.  *See* [Doc. # 351-1 at 6-9].  To the extent that Morgan Keegan claims CVR is liable to the Bondholders for fraudulent omission, this claim fails for the same reason as Morgan Keegan's claim for fraudulent misrepresentation.  Under Missouri law, fraudulent omission is not an independent tort, but rather "[a] variation of fraudulent misrepresentation."  *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1064 (8th Cir. 2005); *see also Gannon Joint Venture Ltd. P'ship v. Masonite Corp.*, No. 4:07CV1242 JCH, 2008 WL 2074108, at *4 (E.D. Mo. May 14, 2008).  This variation provides that " '[s]ilence or nondisclosure of a material fact, *when used as an inducement to another*, can be an act of fraud[,]' but only when an individual has a duty to speak."  *Wild v. Trans World Airlines, Inc.*, 14 S.W.3d 166, 167 (Mo. Ct. App. 2000) (quoting *Andes v. Albano*, 853 S.W.2d 936, 943 (Mo. 1993)) (emphasis added).

Consequently, Morgan Keegan fails to state a claim for fraudulent omission because Morgan Keegan has not alleged that CVR omitted any information with the intent or expectation that its omission would influence the bond purchasers' investment decision.  As an omission of a material fact only satisfies the first element of fraudulent misrepresentation, and thus does not relieve a party from establishing the other essential elements, the absence of a plausible allegation that CVR expected or intended any

omission to influence the bond purchasers' investment decision is fatal to Morgan Keegan's claim.

In addition, as discussed above, Morgan Keegan specifically alleges that CVR acquired the omitted information through investigations performed on behalf of its clients and that CVR provided the results of these investigations to its clients. Morgan Keegan has not cited any authority suggesting that an attorney has a legal duty to disclose to third-parties information revealed through an investigation performed on behalf of a client, absent some intent by the attorney to influence a third-party's conduct in a transaction. Furthermore, a duty to speak so broadly defined, that is not limited by the requirement of intent or reason to expect to influence a third-party, would appear contrary to basic principles of the attorney-client relationship. *See, e.g.*, *Fox v. White*, 215 S.W.3d 257, 260 (Mo. Ct. App. 2007) ("The attorney, with limited exceptions,[] owes no actionable duty to strangers or non-parties to the attorney-client relationship in the way legal responsibilities are performed."). Thus, Morgan Keegan has failed to plausibly allege that CVR is liable to the Bondholders for fraudulent misrepresentation, either indirect or by omission.

### B. Whether CVR Owed a Duty to the Bondholders to Ensure the Accuracy of the Official Statement

At oral argument, Morgan Keegan did not focus on its misrepresentation claims. Instead, it relied primarily on the theory that CVR had ultimate authority over the contents of the Official Statement and, as a result, had a duty to the Bondholders to ensure the accuracy of that document. Based on Morgan Keegan's representations during

that hearing, the Court requested supplemental briefing on the nature and origin of this duty.

When pressed to provide some authority for the existence of this duty, however, Morgan Keegan began by revising the question posed by the Court and seemingly reverted to a theory of misrepresentation. Specifically, Morgan Keegan elected, at the outset of its supplemental brief, to "assume[] that the Court seeks case law that shows that attorneys who assume broader roles in investigating circumstances underlying a bond offering and preparing offering documents can be liable to persons or entities who relied on the information provided by the attorney when the attorney knows, or should know, that the information to be contained in the [Official Statement] is materially misleading." [Doc. # 333 at 2]; *see also* [Doc. # 333 at 3] ("Morgan Keegan alleges that CVR intentionally or negligently misrepresented facts which now form the basis of [the Bondholders'] intentional fraud, negligence, and Missouri Securities Act claims, and Morgan Keegan's third-party petition.").

The authorities presented by Morgan Keegan in its supplemental brief appear to confirm that Morgan Keegan was relying on a theory of misrepresentation. The only potentially relevant decisions cited by Morgan Keegan in its brief concerned fraudulent or negligent misrepresentation, and those cases specifically discussed the element of influencing another party's conduct, an allegation that is not present in Morgan Keegan's Third-Party Complaints against CVR. *See Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, N.A.*, 892 P.2d 230, 235-37 (Colo. 1995) ("[B]y issuing legal opinion letters *for the purpose of inducing* respondent to purchase the . . . Bonds, petitioners may

14

be liable to respondent for negligent misrepresentation." (emphasis added)); *Haberman v. Wash. Pub. Power Supply Sys.*, 744 P.2d 1032, 1067-68 (Wash. 1987) ("Conceivably, the professionals could have *intended* that intervenors, as institutional investors, benefit from the information *so as to induce them* to purchase bonds, . . . ." (emphases added)); *see also Bennett v. Durham*, 683 F.3d 734, 738 (6th Cir. 2012) ("[A]n attorney who knowingly drafted false or misleading documents would face other problems. He might be liable for fraud, . . . ."). Accordingly, these cases do not support the proposition that CVR owed any general duty to the Bondholders to ensure the accuracy of the Official Statement.

The remaining cases cited by Morgan Keegan in its supplemental brief also provide no support for Morgan Keegan's ultimate authority theory or the proposition that CVR had any independent duty to ensure the accuracy of the Official Statement. The cited decisions all involved the interpretation of federal securities law, for instance whether the defendant was sufficiently involved in the sale of or offer to sell a security to be considered a seller within the meaning of the Securities Act of 1933. *See Wasson v. S.E.C.*, 558 F.2d 879, 885-86 (8th Cir. 1977); *see also Cronin v. Midwestern Okla. Dev. Auth.*, 619 F.2d 856, 862 (10th Cir. 1980), (considering the theoretical reach of aider and abettor liability under federal securities law), *implied overruling recognized by Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996). Furthermore, in several instances, Morgan Keegan simply quotes a court's generic description of a plaintiff's allegations in a decision that did not otherwise consider, explain, or endorse the legal or factual basis of the claim. *See T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth.*, 717

F.2d 1330, 1333 (10th Cir. 1983); *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1103 (Colo. 1995); *Sec. Bank & Trust Co. of Ponca City, Okla. v. Fabricating, Inc.*, 673 S.W.2d 860, 861-62 (Tenn. 1983). No ruling or reasoning in any of these decisions provides support for the existence of a general duty owed by CVR to the Bondholders to ensure the accuracy of the contents of the Official Statement.

Nonetheless, Morgan Keegan maintains that it has alleged that "CVR conducted its own investigation with respect to the statements that [the Bondholders] assert are materially false or misleading in the Official Statement," that "CVR acted negligently," and that "[t]his is all that is required to state a claim for contribution." [Doc. # 227 at 15]. Negligence alone, however, is not sufficient to establish CVR's liability to the Bondholders. CVR's alleged negligence can only render it liable to the Bondholders if its negligent conduct breached a duty that CVR owed to the Bondholders. *See, e.g.*, *Blevins v. Am. Family Mut. Ins. Co.*, 423 S.W.3d 837 (Mo. Ct. App. 2014).

Morgan Keegan argues that CVR "had a foreseeable duty to subsequent purchasers to ensure" the accuracy of the Official Statement and that this "is precisely the same basis for Plaintiffs' assertions of liability against Morgan Keegan." [Doc. # 227 at 12]. The critical difference, however, is that CVR is not alleged to have made any material misrepresentations or supplied any false information to the Bondholders for the purpose of guiding their decision to purchase the bonds. *Cf.* [Doc. # 41 at 19] ("The statement that Morgan Keegan reasonably believed the information contained in the Official Offering Statement was accurate and complete . . . was supplied by Morgan Keegan in the course of business *and intentionally provided as a guide in business*

16

*transactions*." (emphasis added)).  Similarly, although substantial authority supports the

proposition that the underwriter owes such a duty to prospective investors, *see* [Doc. # 41

at 8-9] (collecting cases), Morgan Keegan has not presented any authority suggesting that

bond counsel owes a similar duty to this class of persons, even though the Court gave

Morgan Keegan additional time to supply that authority.  Nor has the Court been able to

identify any cause of action based on Morgan Keegan's ultimate authority theory.

The alleged existence of this duty also lacks a well-pled factual basis.  With

respect to the CVR's purported ultimate authority over the Official Statement, Morgan

Keegan's Third-Party Complaint contains only the bare assertion that "[a]s bond counsel

and financial advisor[2] to these entities [Moberly and the Authority], CV&R directly or

indirectly controlled the representations made in the [] Official Statement."  [Doc. # 156

at 8].  Morgan Keegan's proposed Amended Third-Party Complaint adds the following,

similarly conclusory assertion:

> CV&R assumed responsibility for all the contents of the agreements and
> the [] Official Statement.  No representation regarding Moberly, the IDA,
> or Mamtek would have been included in the [] Official Statement without
> approval from CV&R.  As such, CV&R had ultimate authority over the
> contents of the Official Statement.

[Doc. # 351 at 9].  But these conclusory allegations couched as factual allegations are

contrary to facts actually included in Morgan Keegan's pleadings, such as Morgan

Keegan's reference to the following two paragraphs of the Official Statement:

---

[2] Although Morgan Keegan has repeatedly argued and cited some authority to support the
proposition that CVR, as financial advisor to Moberly, owed a fiduciary duty Moberly, *e.g.*,
[Doc. # 227 at 12 n.6], Morgan Keegan has never drawn any connection between this duty to
Moberly and CVR's elusive duty to the Bondholders.

> The Bonds are offered when, as, and if issued by the Authority, subject to the approval of legality by [CVR] . . . . Certain legal matters will be passed upon for the Authority by [CVR].
>
> ***
>
> Legal matters incident to the authorization, issuance, and sale of the bonds are subject to the approving legal opinion of [CVR] . . . , whose approving opinion will be delivered with the Bonds.

[Docs. ## 156 at 7; 351-1 at 10-11]. This language does not suggest that CVR was responsible for approving or validating all of the factual representations set forth in the Official Statement. Rather, these provisions show that CVR provided only a legal opinion concerning the authorization, issuance, and sale of the bonds, which is consistent with the provision of the letter agreement executed between Morgan Keegan and the Authority that is also referenced in Morgan Keegan's pleadings. *See* [Docs. ## 156 at 4; 351-1 at 5]. Consequently, Morgan Keegan has presented no basis in fact or law that suggests CVR, by providing this type of approving opinion, assumed full responsibility for all of the representations made in the offering documents. S*ee also* [Doc. # 196-1 at 1] (e-mail from Tom Cunningham of CVR to Mamtek's COO, dated May 20, 2010)

Finally, the proposed Amended Third-Party Complaint also makes the allegation that CVR "made and/or validated the statements set forth in the Official Statement regarding Mamtek's sucralose plant in China . . . ." [Doc. # 351-1 at 6]. This statement directly conflicts with Morgan Keegan's adamant assertion that "the representations in the [] Official Statement were the representations of the ***Authority***," [Docs. ## 156 at5; 351-1 at 8]. Morgan Keegan never alleges that CVR had a role in drafting the Official Statement, and in fact alleges that CVR "anticipated that the underwriter [Morgan

Keegan] would 'Circulate First Draft of POS [Preliminary Official Statement]." [Docs. ## 156 at 4; 351-1 at 5]. Furthermore, Morgan Keegan's suggestion that CVR is somehow responsible for the representations of its client, the Authority, is contrary to basic principles of the attorney-client relationship. *See Roth v. La Societe Anonyme Turbomeca France*, 120 S.W.3d 764, 776 (Mo. Ct. App. 2003) (refusing to impute to an attorney his client's representations made in response to interrogatories and ruling, "Although an attorney is an agent of his or her client and acts as the client's alter ego, the converse is not true.").

In sum, Morgan Keegan's conclusory assertion that CVR owed a duty to the Bondholders to ensure the accuracy of the entire Official Statement, whether premised on CVR's purported ultimate authority over this document or otherwise, lacks a plausible basis in fact or law. Accordingly, Morgan Keegan's claims for contribution and indemnity, to the extent that they are premised on this theory, must be dismissed.

## C. Missouri's Blue Sky Law

Morgan Keegan also argues that CVR is jointly and severally liable for the Bondholders' claims under the Missouri Blue Sky Law. Specifically, Morgan Keegan relies on the provision of this statute establishing joint and several liability as to any "individual who is an employee of or associated with a person liable under [the Blue Sky Law] and who materially aids the conduct giving rise to the liability." Mo. Rev. Stat. § 409.5-509(g)(3). Morgan Keegan maintains that it has stated a claim under this provision because it "has pled that CVR is associated with the Issuer [the Authority] and that it materially aided the Issuer in investigating Mamtek and in preparing the Official

Statement." [Doc. # 227 at 18]. CVR responds that this provision is not applicable to CVR in the context of this case because the Authority "did not sell the Bonds to the Bondholders" and is thus "not a 'person liable' under the statutes." [Doc. # 242 at 10]. Rather, Morgan Keegan purchased the bonds from the Authority, and then sold the bonds to the Bondholders.

Morgan Keegan has not attempted to explain how, or provided any authority that suggests, the Authority, as a remote seller, could be liable to the Bondholders under the Blue Sky Law, such that derivative liability might attach to CVR based on its relationship with the Authority. The only case on point cited by either party held that, under federal securities law, "[t]o be liable as a seller, the defendant must be the 'buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller.'" *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 659 (S.D.N.Y. 2004) (quoting *Pinter v. Dahl*, 486 U.S. 622, 644 n.21 (1988)). As Morgan Keegan acknowledges that federal law "is often analogized to state securities laws," [Doc. 333 at 4], and provides no authority interpreting Missouri's Blue Sky Law in a different manner, there is no basis for finding that the Authority could be liable to the Bondholders under the Blue Sky Law.

Consequently, Morgan Keegan has failed to show that CVR can be held jointly and severally liable on the claims of the Bondholders based on its association with the Authority. To the extent that Morgan Keegan's proposed Amended Third-Party Complaint attempts to state a claim under section 409.5-509(g)(1), which establishes joint and several liability as to any "person that directly or indirectly controls a person

20

liable," *compare* [Doc. # 351-1 at 351-1 at 13] ("CV&R directly or indirectly controlled the representations made in the [] Official Statement."), this claim fails for the same reason.  In addition, for the reasons discussed above, Morgan Keegan has not plausibly alleged that CVR directly or indirectly controlled the representations of its client, the Authority, which further precludes any claim based on this section.

Finally, in a footnote, Morgan Keegan alternatively claims that CVR is liable under section 409.5-509(g)(4), which provides for joint and several liability as to any "person that is a broker-dealer, agent, investment advisor, or investment adviser representative that materially aids the conduct giving rise to [] liability."  Morgan Keegan argues that CVR qualifies as an investment adviser as used in this section because it was the financial adviser to the Authority.  Morgan Keegan cites no authority to support this proposition, which seems debatable in light of the fact that the Blue Sky Law expressly excludes from the definition of investment adviser "[a] lawyer, . . . whose performance of investment advice is solely incidental to the practice of the person's profession."  § 409.1-102(15)(B).

In any event, Morgan Keegan has failed to allege that CVR materially assisted in the conduct giving rise to liability under the Blue Sky Law in this case.  The Bondholders' claims are premised on misrepresentations and omissions in the Official Statement, as well as the transmission of the same misrepresentations and omissions in various materials disseminated by Morgan Keegan.  As discussed above, although Morgan Keegan alleges that it chose to rely on CVR's representations concerning these matters, Morgan Keegan has not plausibly alleged that CVR expected or intended its

conduct to influence the bond purchasers.  There is also no plausible allegation that CVR drafted any of the documents that form the basis of the Bondholders' claims or provided an opinion on the factual accuracy of the contents of those documents.  Absent some argument or authority to the contrary, this Court cannot conclude that CVR materially assisted the conduct giving rise to the Bondholders' claims based on the allegation that it conducted "an independent analysis of the pros and cons of the proposed transaction . . . on behalf of the Authority," its client, [Doc. # 351-1 at 4-5].

Consequently, Morgan Keegan has failed to present any theory, in either its Third-Party Complaint or proposed Amended Third-Party Complaint, under which CVR might be originally liable to the Bondholders and, as a result, Morgan Keegan's claims for contribution and indemnity must be dismissed.

## IV.    Conclusion

For the foregoing reasons, Morgan Keegan's motion for leave to file an Amended Third-Party Complaint, [Doc. # 351], is DENIED as futile, and CVR's motion to dismiss Morgan Keegan's Third-Party Complaint, [Doc. # 194], is GRANTED.  Morgan Keegan's Third-Party Complaint against CVR is hereby DISMISSED.


Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: 5/13/2014
Jefferson City, Missouri