# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

JOHN W. CROMEANS, JR., et al.,      )
                                              )
          Plaintiffs,        )
                                              )
          v.                 )        No. 2:12-CV-04269-NKL
                                              )
MORGAN KEEGAN & CO., INC., et al.,   )
                                              )
          Defendants.      )

## ORDER

Pending before the Court is the Plaintiffs' Motion for Class Certification [Doc. 218]. The motion is granted in part and denied in part.

## I.    Background

On July 15, 2010, the City of Moberly, Missouri approved the issuance of $39 million in municipal bonds by the Industrial Development Authority of the City of Moberly (the IDA). The IDA issued the bonds to finance a project that included acquiring and improving a 33-acre parcel of land, and constructing and equipping a sucralose manufacturing and processing facility in Moberly. The facility was to be operated by Mamtek U.S., Inc., a Delaware corporation registered to transact business in Missouri.

The City hired Defendant Morgan Keegan & Company, Inc., a Tennessee corporation, to underwrite the bonds. As underwriter, Morgan Keegan was responsible for preparing the Official Offering Statement, which provided information about the bond offering to prospective purchasers. Morgan Keegan engaged Defendant Armstrong

Teasdale, a St. Louis-based limited partnership, to serve as underwriter's counsel. The legal services Armstrong Teasdale provided included preparing the offering materials, a bond purchase agreement, and continuing disclosure agreement, as well as generally advising Morgan Keegan in connection with issuance of the bonds by the IDA.

In July 2010, Morgan Keegan purchased the bonds from the IDA, then sold them to about 133 persons or entities. About 30 of the bonds were sold to Missouri residents and the remainder to residents of 18 other states. Some of the bonds were subsequently resold one or more times. The trustee bank, UMB Bank, N.A., located in Missouri, held the proceeds of the sales of the Moberly Bonds, and disbursed the proceeds to Bruce Cole, the project promoter, who allegedly was not entitled to them. The Mamtek project failed and the bonds are now alleged to be worthless.

This putative class action was filed on behalf of the bond purchasers (collectively, the Bondholders). The Bondholders' claims are based in substantial part on alleged material misrepresentations and omissions contained in the Official Offering Statement, and the Defendants' alleged failure to conduct a due-diligence investigation concerning the accuracy of the representations in the statement. The Official Offering Statement included the following allegedly false claims:

- Mamtek operated a fully-functional sucralose production facility in China;
- Mamtek was one of only two significant global sucralose manufacturers;
- The US Patent and Trademark Office would grant Mamtek a patent on its sucralose manufacturing process within months;

- Mamtek's unique manufacturing processes neither required nor produced any hazardous substances or resulted in any hazardous waste;
- Mamtek expected exponential expansion in production lines over the next two years;
- Mamtek had a sales contract with a Chinese company called Xibo Pharmaceutical Group;
- Mamtek had pledged valuable collateral as security for the bonds, which had been evaluated by a boutique valuation company, Pelligrino & Associates, LLC.

[Doc. 41, pp. 10-11 of 27.]  It also contained the following paragraph:

> The Underwriter has reviewed the information in this Official Statement in accordance with and as part of its responsibilities to investors under the Federal Securities Laws as applied to the facts and circumstances of this transaction and reasonably believes such information to be accurate and complete, but the Underwriter does not guarantee the accuracy or completeness of such information.
>
> [*Id.*]

The Plaintiffs claim that the Defendants did not review the information in the Official Offering Statement and had no basis for believing that such information was accurate or complete.  They also claim that Morgan Keegan representatives made additional false statements by email and in oral discussions.  Finally, Plaintiffs claim that if Morgan Keegan and Armstrong Teasdale had conducted the Mamtek investigation with due diligence, they would have quickly discovered that numerous representations by Mamtek were false.

The Plaintiffs ask for certification of all claims contained in the first amended complaint.  [Doc. 66-1.]  The Court previously entered summary judgment in favor of

Defendant Armstrong Teasdale on two claims against it, negligent misrepresentation and omissions, and attorney malpractice [Doc. 170]. The remaining claims are:

| | | |
|---|---|---|
| Count I | negligent underwriting, against Defendant Morgan Keegan; |
| Count II | negligent misrepresentation and omissions, against Defendant Morgan Keegan; |
| Count III | fraudulent misrepresentations and omissions, against both Defendants; |
| Count IV | Missouri Blue Sky law violations, against both Defendants; |
| Count V | moneys had and received, against both Defendants; and |
| Count VI | unjust enrichment, against both Defendants. |

[Doc. 66-1.]

## II.    Discussion

The following requirements must be met under Federal Rule of Civil Procedure 23(a) to maintain suit as a class action:

(1) The class is so numerous that joinder of all members is impracticable;
(2) There are questions of law or fact common to the class;
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) The representative parties will fairly and adequately protect the interests of the class.

One of the three subsections of Rule 23(b) must also be met. The Plaintiffs elect to proceed under Rule 23(b)(3), which provides that:

[T]he questions of law or fact common to the members of the class predominate over any questions affecting only

4

individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:

(A)   the class members' interests in individually controlling the prosecution or defense of separate actions;
(B)   the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C)   the desirability of concentrating the litigation of the claims in the particular forum; and
(D)   the likely difficulties in managing a class action.

Rule 23 also permits part of a claim to be certified under some circumstances. *See* Fed. R. Civ. Pro. 23 (c)(4).

To prevail on their motion, the Plaintiffs must "affirmatively demonstrate" their compliance with Rule 23. *Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551-52 (2011). A district court has broad discretion in determining whether class certification is appropriate. *Luiken v. Domino's Pizza, LLC,* 705 F.3d 370, 372 (8th Cir. 2013). Nevertheless, a class action cannot be certified unless the court "'is satisfied, after rigorous analysis, that the prerequisites of'" the rule have been met. *Dukes*, 131 S.Ct. at 2551 (quoting *General Telephone Co. v. Falcon,* 457 U.S. 147, 160 (1982)).

### A. Preliminary issues

Morgan Keegan preliminarily argues that class treatment is precluded because the Plaintiffs' definition of the class is overly broad, and because the Plaintiffs and many putative class members have binding agreements that require them to arbitrate any claims. Neither argument is persuasive.

Case 2:12-cv-04269-NKL   Document 510   Filed 09/23/14   Page 5 of 31

### 1. Definition of the class

The Plaintiffs have proposed a class that consists of:

> All persons who purchased Moberly bonds from July 23,
> 2010 through Sept. 30, 2011 [the date of the first offering and
> the date Morgan Keegan reduced the price of the bonds,
> respectively].

[Doc. 219, p. 16.]

While the Eighth Circuit has not addressed the issue, the Court will assume that the proposed class must be definite or ascertainable. *See Matamoros v. Starbucks Corp.,* 699 F.3d 129, 139 (1st Cir. 2012); *In re. Initial Public Offerings Securities Litigation,* 471 F.3d 24, 30 (2nd Cir. 2006); *Chiang v. Veneman,* 385 F.3d 256, 271 (3rd Cir. 2004); *John v. Nat'l Sec. Fire and Cas. Co.,* 501 F.3d 443, 445 (5th Cir. 2007); and *Marcus v. BMW of N.A., LLC,* 687 F.3d 583, 593 (7th Cir. 2012).

Morgan Keegan argues that the class is not sufficiently ascertainable because the persons who did not purchase bonds directly from Morgan Keegan may be difficult to identify, inasmuch as Morgan Keegan does not know who they are. This argument does not persuade the Court because Morgan Keegan's knowledge does not determine whether the identity of the class can be ascertained. Given the objective criteria in the definition, it is more likely than not that the purchasers of the Moberly Bonds can be identified through discovery, and by tracing secondary sales from purchasers who did buy directly from Morgan Keegan.

### 2. Arbitration agreements

The three named Plaintiffs and a number of other putative class members—about 70 in all—signed arbitration agreements with Morgan Keegan. Morgan Keegan argues that Bondholders with arbitration agreements are required to arbitrate—not litigate—their claims. [*E.g.* Doc. 259, p. 30 (arbitration agreements cannot "be vitiated by simply filing a class action").] Morgan Keegan also argues that "consistent with the" Federal Arbitration Act (FAA), such Bondholders should be "exclude[d] from any purported class[.]" [Doc. 259, p. 32.]

A valid arbitration agreement is a contract and enforced according to its terms. *Owen v. Bristol Care, Inc.,* 702 F.3d 1050, 1051 (8th Cir. 2013). "[A] party cannot be forced to submit to arbitration any dispute he has not agreed to submit." *Keymer v. Management Recruiters Intern, Inc.,* 169 F.3d 501, 504 (8th Cir. 1999). Here, the arbitration agreements explicitly exempt arbitration of claims that are being dealt with in a class action, or are the subject of a not-as-yet-ruled motion to certify a class. [*E.g.,* Doc. 259-17, p. 4 of 8; and Doc. 259-18, pp. 3-4 of 30.] Both parties agreed to this provision and Morgan Keegan cites no section of the FAA nor any other law that prevents the parties' voluntarily agreement to this limitation

The arbitration agreements are not an impediment to class certification.

## B. Rule 23(a) factors

### 1. Rule 23(a)(1), Numerosity

Rule 23(a)(1) requires the proposed class be "so numerous that joinder of all members is impracticable." In considering this requirement, courts examine the number of persons in the proposed class and factors such as the nature of the action, the size of

the individual claims, and the inconvenience of trying the individual claims. *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561 (8th Cir. 1982). The Eighth Circuit has not established a rigid rule regarding the size of the proposed class that will satisfy this requirement. *Rattray v. Woodbury County, Iowa,* 253 F.R.D. 444, 452 (N.D. Iowa 2008), *order aff'd,* 614 F.3d 831 (8th Cir. 2010). "A relatively small number of plaintiffs does not necessarily defeat class certification" if, for example, geographic dispersion of the potential plaintiffs demonstrates that joinder is impractical. *Id. See, e.g., Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 878 (11th Cir. 1986) (certifying geographically dispersed class of at least 31 members); *Gaspar v. Linvatec Corp.,* 167 F.R.D. 51, 56 (N.D. Ill. 1996) (certifying geographically dispersed class of 18 members).

When the question of numerosity is a close one, courts tend to strike a balance in favor of finding numerosity. *E.g., Evans v. U.S. Pipe & Foundry Co.,* F.2d 925, 930 (11th Cir. 1983); *Cortez v. Neb. Beef Inc.*, 266 F.R.D. 275, 289 (D. Neb. 2010); and *Foster v. Bechtel Power Corp.,* 89 F.R.D. 624, 626 (E.D. Ark. 1981).

Here, the proposed class is composed of at least 133 Bondholders—counting just those who purchased directly from Morgan Keegan. [Doc. 259, p. 45.] The class members are geographically dispersed across 19 states [*id.*], making joinder in a single lawsuit more difficult. While there is evidence that some class members have initiated their own lawsuits, Morgan Keegan has not shown that the class members pursuing individual litigation will opt out of any class that is certified. Further, even if all 40 class members pursuing individual lawsuits [Doc. 259, pp. 19-24; Exhibits C-H] opted out, the proposed class remains sufficiently numerous and geographically dispersed as to satisfy

8

the numerosity requirement.

### 2. Rule 23(a)(2), Commonality

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of law[.]" *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011) (quotations omitted). "Their claims must depend upon a common contention…that is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Even a single common question will do. *Id.* at 2556 (internal quotation and citation omitted).

Here, common issues link the class members and are substantially related to the litigation's resolution. All claims—negligent underwriting, negligent misrepresentation, fraudulent misrepresentation, Missouri Blue Sky law, unjust enrichment, and moneys had and received—involve overlapping disputes: the alleged material misrepresentations and omissions contained in the Official Offering Statement, the Defendants' alleged failure to adequately investigate the accuracy of the representations in the Official Statement, and current value of the bonds. *See Bussey v. Macon County Greyhound Park, Inc.,* 2014 WL 1302658 *5 (11th Cir. 2014); *Bilotta v. Citizens Information Associates, LLC,* 2014 WL 2050853 *3 (M.D. Fla. 2014); *Alvarez v. Keystone Plus Construction Corp.,* 2014 WL 1400846 *5 (D.D.C. 2014). Further, these common issues can be resolved in a single stroke by class litigation.

Commonality is satisfied.

### 3. Rule 23(a)(3), Typicality

Rule 23(a)(3) requires that a class representative have the same or similar grievances as the members of the class. *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir. 1996). The element of typicality is generally considered satisfied if the claims or defenses of the representatives and class members "stem from a single event or are based on the same legal procedure or remedial theory." *Paxton v. NovaStar Financial, Inc.,* 688 F.2d 552, 562-563 (8th Cir. 1982). Class representatives need not share identical interests with the class, only common objectives and legal and factual positions. *Uponer Inc., F1807 Plumbing Fittings Products Liability Litig.,* 716 F.3d 1057, 1064 (8th Cir. 2013) (quotations and citation omitted). Put another way, the class representatives' interests cannot be antagonistic to the class members' interests. *Id.* (citation omitted).

Typicality will not be destroyed unless a class representative is "subject to a unique defense that threatens to play a major role in the litigation." *Id.* (quoting *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999)). For example, in *Alpern*, 84 F.3d at 1540, the Court concluded that the claims of the named plaintiff, who purchased securities as part of the defendant's dividend reinvestment plan, were typical of the class—including individuals who purchased the securities on the open market—because all purchasers challenged the defendant's course of conduct under the securities laws and invoked the same theory of securities fraud, i.e., making knowing misleading statements or omissions.

Similarly, the three Plaintiffs have the same or similar grievances as other

Bondholders. The Plaintiffs' claims are based on the alleged material misrepresentations and omissions contained in the Official Offering Statement, and the Defendants' failure to conduct a due-diligence investigation concerning the accuracy of the representations in the Official Statement. All Bondholders were allegedly injured by the same course of conduct. The common theory of damages requires proof that the bonds are worthless as a result of a misrepresentation or omissions.

Nonetheless, Morgan Keegan argues that the three named Plaintiffs are not typical. First, Morgan Keegan argues that two of the Plaintiffs relied on oral statements, and that such statements by their nature could not have been standardized. Nothing before the Court demonstrates that the content of the oral statements was so different from the information available to other putative class members as to render the two Plaintiffs atypical of the class. The possibility that an oral statement might differ from the written statement is not sufficient, particularly because of the alleged control Morgan Keegan exercised over oral statements by brokers.

Next, citing its experts' affidavits and without further explanation, Morgan Keegan states that the Plaintiffs purchased the bonds under circumstances atypical of the broader class. [Docs. 259-28, 259-28, and 259-31.] According to Morgan Keegan's own evidence, the three Plaintiffs are an individual investor, a bank, and a representative of an estate, who purchased bonds during the proposed class period, and their purchases fell above and below the average investment amount. The evidence does not show that the three Plaintiffs are subject to unique defenses that threaten to play a major role in the litigation, or that their claims are antagonistic to the other class members' claims.

Morgan Keegan also argues that the Plaintiffs' claims are not typical because they, but not all class members, are subject to binding arbitration. Because the Court has found that the arbitration clause is not applicable to any Plaintiff or putative class member, this argument also fails.

Typicality is satisfied.

### 4. Rule 23(a)(4), Adequacy

Under Rule 23(a)(4), "the representative parties must fairly and adequately protect the interests of the class." This means the class representatives and their attorneys must be "able and willing to prosecute the action competently and vigorously," and that "each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *Carpe v. Aquila, Inc.*, 224 F.R.D. 454, 458 (W.D. Mo. 2004).

Based on the record, the Court finds that the Plaintiffs and their counsel are vigorously and competently pursuing their claims, and will continue to do so on behalf of the class. The Plaintiffs' counsel is qualified. Further, the Plaintiffs' claims are based in substantial part on alleged material misrepresentations and omissions contained in the Official Offering Statement, and the Defendants' failure to conduct a due-diligence investigation concerning the accuracy of the representations in the Official Statement. The other Bondholders were allegedly injured by same course of conduct. The common damages thread is the alleged worthlessness of the bonds for which the Plaintiffs and putative class members paid valuable consideration. In these circumstances, it is unlikely

Case 2:12-cv-04269-NKL   Document 510   Filed 09/23/14   Page 12 of 31

that the Plaintiffs' goals and viewpoints will diverge from those of the putative class members.

Morgan Keegan nonetheless challenges adequacy in two respects. [Doc. 259, pp. 36-37 of 46.] First, it argues putative class members may be unhappy that their right to a jury trial has been waived because of the jury-trial waiver provision in the Plaintiffs' written agreements with Morgan Keegan. The Plaintiffs respond that they requested a jury trial when they filed this case and argue that Morgan Keegan has by now waived its opportunity to enforce those contractual waivers. But the Court need not resolve that issue because Morgan Keegan has not waived its own right to a jury trial in these proceedings. [Doc. 359, p. 53 of 75.] Therefore, the *status quo* is trial by jury and any jury trial waivers do not make the Plaintiffs inadequate representatives.

Morgan Keegan also argues that the three Plaintiffs' interests are adverse to one putative class member, who happens to be a defendant in another lawsuit. That individual is not a defendant in this lawsuit and there is no evidence of a connection between the Plaintiffs' claims here and the claims against that individual in the other lawsuit. Thus there is no showing that Plaintiffs' interests are adverse to the interests of any putative class members.

C. **Rule 23(b)(3) factors - Predominance and Superiority**

Under Rule 23(b)(3), questions of law or fact common to the members of the class must predominate over questions affecting only individual members, and class action must be a superior vehicle for fair and efficient adjudication. The Plaintiffs ask that all claims be certified: negligent underwriting; negligent misrepresentation and omissions;

13

fraudulent misrepresentations and omissions; Missouri Blue Sky law violation; moneys had and received; and unjust enrichment.

The predominance requirement "tests whether proposed class members are sufficiently cohesive to warrant adjudication by representation." *In re Zurn Pex Plumbing Products Liab. Litig*., 644 F.3d 604, 618 (8th Cir. 2011) (quoting *Amchem*, 521 U.S. 591, 623 (1997)). Predominance is achieved if the common questions of law or fact generally represent a significant aspect of the case and can be resolved for all class members in a single adjudication. See 7A Charles A. Wright, Arthur A. Miller & Mary K. Kane, Federal Practice & Procedure 1778, at 528 (2d ed. 1986). "At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence." *Avrit v. Reliastar Life Ins. Co*., 615 F.3d 1023, 1029 (8th Cir. 2010). To make this determination, a court must "undertake 'a rigorous analysis' that includes examination of what the parties would be required to prove at trial." *Id*. *See also Blades v. Monsanto Co.,* 400 F.3d 562, 569 (8th Cir. 2005) (court must examine underlying elements necessary to establish liability for plaintiffs' claims).

Factors relevant to whether class action is the superior vehicle for fair and efficient adjudication include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Rule 23(b)(3).

14

## 1. Predominance

As a preliminary matter, the Court must consider what law will apply to each claim made by the Plaintiffs. This analysis is not only necessary to resolve Rule 23 issues, but also to protect the constitutional right of putative class members to have their claims decided according to the law of a state with a sufficient nexus to each class member. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 822-23 (1985); and *In re St. Jude Med., Inc.,* 425 F.3d 1116, 1120 (8th Cir. 2005). To conduct the choice of law analysis, a court applies the choice of law rules of the state where the court sits, in this case, Missouri. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941); *American Guarantee Liability Ins. Co. v. U.S. Fidelity & Guarantee Co.,* 668 F.3d 991, 996 (8th Cir. 2012). But a court need not undertake a choice-of-law inquiry unless an actual conflict of law is demonstrated. *Kamrath*, 475 F.3d at 924 (citation omitted).

### a. Effect of the contractual choice of law provision

The Client Agreements between Morgan Keegan and some putative class members includes the following choice-of-law provisions: "This Agreement and its enforcement shall be governed by the laws of Tennessee, and federal law as applicable." [*E.g.,* Doc. 289-3, p. 7 of 81.] However, a choice of law provision can be waived. *Pill v. Estate of Pilla,* 689 S.W.2d 727, 738. (Mo. Ct. App. 1985). Waiver may be effected by the conduct of the parties to the contract. *JTL Consulting, LLC v. Shanahan,* 190 S.W.3d 389, 396 (Mo. Ct. App. 2006). When a party does not invoke the state law designated in a contractual choice of law provision, the party has waived it. *Id. See also Watters v. Travel Guard Int'l,* 136 S.W.3d 100, 106 (Mo. Ct. App. 2004) (when the parties had a

contractual choice of law clause invoking Wisconsin law, but filed for summary judgment under Missouri law and never objected to application of Missouri law, enforcement of the Wisconsin choice of law clause was waived).

Morgan Keegan filed a motion to dismiss and suggestions [Docs. 25, 26 and 38], none of which invoked the Tennessee choice of law provision. Morgan Keegan does not seek to invoke Tennessee law in the context of the motion for class certification and briefing, nor even in its supplemental briefing on choice of law, filed at the Court's request [Docs. 357 and 362]. Accordingly, Morgan Keegan has waived enforcement of the Tennessee choice of law provision both as to the Plaintiffs and the class members.

### b. Negligent and fraudulent misrepresentation

No conflicts analysis is necessary if there is no variation between the forum state's law and the law of the states where the putative class members reside. *See Phillips,* 472 U.S. at 816. Here, regardless of which state law applies, a negligent or fraudulent misrepresentation claim requires proof of reliance. Neither party argues otherwise. They vigorously disagree as to the propriety of certification given the reliance requirement.

The normal rule is that class certification is not appropriate if reliance must be proven. *Jensen v. SIPCO, Inc.,* 38 F.3d 945, 953 (8th Cir. 1994) (claim that required proof of individual class members' reliance on a material misrepresentation "is not suitable for class-wide relief"); *Darms v. McCulloch Oil Corp.*, 720 F.3d 490, 493 (8th Cir. 1983) (no predominance where defendants made separate oral and written representations to each plaintiff; the representations allegedly caused the injury and the plaintiffs relied on them to differing degrees). *See also Gunnels v. Healtplan Svs., Inc.*,

16

348 F.3d 417, 434-435 (4th Cir. 2003); *Castano v. American Tobacco Co.,* 84 F.3d 734, 745 (5th Cir. 1996); *Mazza v. American Honda Motor Co., Inc.,* 666 F.3d 581, 586-87 (9th Cir. 2012).

The Plaintiffs argue that reliance should be presumed based on a "fraud on the market" or "fraud created the market" theory. The Supreme Court has recognized the "fraud on the market" theory in federal securities cases. But that theory depends on there being a a well-developed and efficient market. *Basic Inc. v. Levinson,* 485 U.S. 224, 247 (1988). There is no evidence of such a market here because the bonds were newly issued.

In the case of newly issued securities, some courts have recognized a fraud created the market theory, which assumes investors would not invest in a security that is so worthless no investor would buy them if the investor had been properly informed. Michael Kaufman, *Fraud Created the Market*, 63 Ala. L. Rev. 275, 282 (2012). The Supreme Court has not explicitly endorsed or rejected the theory. The seminal fraud created the market case is *Shores v. Sklar,* 647 F.2d 462 (5th Cir. 1981) (en banc), a federal securities fraud action involving tax-exempt bonds, in which the Fifth Circuit articulated the theory for the first time. But circuit courts do not agree on its viability. *Compare Ross v. Bank South, N.A.,* 885 F.2d 723, 729 (11th Cir. 1989) (accepting theory), and *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1130 (7th Cir. 1993) (rejecting it). The Eighth Circuit has neither endorsed nor rejected it. *See In re NationSmart Corp. Sec. Litig.*, 130 F.3d 309, 321 (8th Cir. 1997).

Plaintiffs suggest that Missouri courts would apply the fraud created the market theory to common law claims if the issue were presented to them. But even if Missouri

Case 2:12-cv-04269-NKL   Document 510   Filed 09/23/14   Page 17 of 31

law applies, the Court does not believe a Missouri court would presume reliance for a negligent or fraudulent misrepresentation claim. First, the fraud created the market presumption is not broadly recognized by other jurisdictions, even in the context of federal securities claims. Second, several states have declined to modify their respective common law fraud causes of action to incorporate a fraud on the market theory or fraud created the market theory. *See Kaufman v. I-State Corp.*, 754 A.2d 1188, 1193-94 (N.J. 2000) (rejecting change to New Jersey law, and collecting similar cases from California, Delaware, Florida, and Tennessee). *See also Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.,* 269 F.R.D. 252, 260-61 (S.D.N.Y. 201) (stating court was unaware of any case applying the fraud created the market theory in the context of a common law fraud claim). Moreover, the Missouri legislature has spoken with respect to misrepresentation concerning securities, establishing a statutory cause of action under the Missouri Blue Sky law. Mo. Stat. § 409.5-509. That law already excludes the element of reliance by the injured party. *Id*.

Therefore, the Court concludes that individualized proof of reliance makes class certification inappropriate for Plaintiffs negligent and fraudulent misrepresentation claims.

### c. Missouri Blue Sky law

The same wrongful act can simultaneously violate multiple states' Blue Sky laws. *E.g., In re. National Century Financial Enterprises, Inc. v. Investment Litigation,* 755 F.Supp.2d 857, 881 (S.D. Ohio 2010) (citing *Lintz v. Carey Manor Ltd.,* 613 F.Supp 543, 551 (W.D. Va. 1985)). This is true because of the nature of the public interests that states

enacting Blue Sky laws wish to protect. Jack McClard, *The Applicability of Local Securities Acts to Multi-State Securities Transactions,* 20 U. Rich. L. Rev. 139, 14-42 (Fall 1985). An enacting state is interested in protecting its consumers, "regardless of the origin of the securities." *Id.* The state is also interested in ensuring that its territory is not used as a basis of operation "for purveyors of fraudulent securities, regardless of where they may be marketed. If this were permitted, investors in other states would become distrustful of securities issued from the enacting state. This…interest is directed at protecting legitimate issuers in the state." *Id.* When securities transactions cross state lines, "[t]he states' efforts to advance these interests will always overlap[.]" *Id.* But a state's "interests can be protected without preventing other states from protecting their own interests." *Id.*

Therefore, "[o]verlapping state securities laws do not present a classic conflict of laws question." *Simms Investment Co. v. E.F. Hutton & Co. Inc.,* 699 F.Supp. 543, 545 (M.D.N.C. 1988). *See also BP P.L.C. Securities Litigation v. BP P.L.C.,* 2013 WL 5520067 *10 (S.D. Tx. 2013) (and cases cited therein) (same); *In re. Countrywide Financial Corp. v. Mortgage-Backed Securities Litigation,* 2012 WL 10731957 *14 (C.D. Cal. 2012) (same); *Chrysler Capital Corp. v. Century Power Corp.,* 1992 WL 163006 *2 (S.D.N.Y. 1992) (same); *Barneby v. E.F. Hutton & Co.,* 715 F.Supp. 1512, 1536 (M.D. Fla. 1989) (same); and *Lintz,* 613 F.Supp at 551 (same). *But see In re. Rospatch Securities Litigation,* 1992 WL 226912 *15 (W.D. Mich. 1992) (applying conflicts analysis to determine which Blue Sky law applied).

Nonetheless, a state cannot apply its Blue Sky law to out of state purchasers unless

the state has "'a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'" *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 819 (1985) (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312-313 (1981)). "When considering fairness in this context, an important element is the expectation of the parties." *Phillips,* 472 U.S. at 822.

A significant aggregation of contacts exists here, creating a sufficient nexus with Missouri: (1) The Moberly Bonds were issued by a Missouri municipality; (2) the Bonds are connected to the state of Missouri (e.g., they were issued to raise funds for the construction of a sucralose plant in Missouri); (3) Armstrong Teasdale does business and drafted the Official Statement in Missouri; (4) Morgan Keegan does business in Missouri generally and was hired to be the underwriter for the Moberly Bonds at issue; (5) a plurality of Bondholders who purchased Moberly Bonds from Morgan Keegan are located in Missouri; and (6) the trustee bank, UMB Bank, N.A., is located in Missouri, and held and disbursed the proceeds of the sales of the Moberly Bonds. Applying Missouri's securities law to nonresident purchasers is neither arbitrary nor fundamentally unfair. Indeed, the putative Plaintiffs' claim under the Missouri Blue Sky law is additive and does not diminish their rights under other security laws. Finally, neither Morgan Keegan, Armstrong Teasdale nor the class members would be surprised to learn that disputes involving a Missouri city bond which was issued in Missouri for a Missouri project would be subject to Missouri's Blue Sky law.

Defendants also argue that Plaintiffs and other out of state purchasers do not have standing to assert a violation of the Missouri Blue Sky law and therefore class

certification is not appropriate.  The Missouri Blue Sky law provides in relevant part:  "It is unlawful for a person, in connection with the offer…directly or indirectly…[t]o make an untrue statement of material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading."  Mo. Rev. Stat. § 409.5-501.  The law also imposes liability on a broker-dealer who "materially aids" the unlawful sale of a security.   Mo. Rev. Stat. § 409.5-509(g).

Under Mo. Rev. Stat. § 409.6-610(a), "Section[] 409.5-509 applies] to a person that . . . offers to sell a security [if] the offer to sell . . . is made in this state."    "[A]n offer to sell . . . is made in this state . . . whether or not either party is then present in this state, if the offer . . . [o]riginates from within this state." Mo. Rev. Stat. § 409.6-610(c)(1).  Construing the language of the Colorado Blue Sky law, Colo. Rev. Stat. § 11-51-127(l), which is similar to Missouri's, Mo. Stat. § 409.6-610(a), the Colorado Supreme Court held that an Official Statement covering a municipal bond is an "offer to sell," and is deemed to originate in the state of the issuing municipality. *See Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1105 (Colo. 1995).

The Court liberally and broadly construes Missouri's Blue Sky law, to effect its intended remedial purposes of protecting investors in securities transactions and ensuring that the state's territory is not used as a basis of operation for purveyors of fraudulent securities. The law is not written to exclude but rather to include within its coverage purchasers of Missouri centric bonds even when those bond are sold out of state and even if sold on the secondary market.  Further, Morgan Keegan is alleged to have aided

Case 2:12-cv-04269-NKL   Document 510   Filed 09/23/14   Page 21 of 31

and abetted those out of state sales, so both resident and non-resident class members have standing to pursue a claim under the Missouri Blue Sky law.

Common questions of law therefore predominate with respect to the Missouri Sky claim and that statute protects non-resident purchasers.

### d. Negligent underwriting

Count I, the claim for negligent underwriting, is brought against Defendant Morgan Keegan. The Court has previously examined the elements of this claim under Missouri law are: (1) a duty owed by the defendant to the plaintiff; (2) the defendant's breach of that duty; and (3) the defendant's breach as the proximate cause of the plaintiff's injury. *Stanley v. City of Independence*, 995 S.W.2d 485, 487 (Mo. 1999). [Doc. 41, pp. 7-8.]

The existence of a duty is a question of law, and is determined by considering whether the risk of injury to a certain person or class of persons was the foreseeable result of careless conduct by the defendant. *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 156 (Mo. 2000). A risk of injury is foreseeable if a reasonably careful person in the position of the defendant would have anticipated the risk under the circumstances. *Id.* If the defendant's conduct proximately caused the foreseeable plaintiff to incur the foreseeable injury, the defendant is liable. *Id.* A defendant's conduct is said to "proximately cause" a plaintiff's injury when it, "in a natural and continuous sequence, unbroken by any new cause, produces the event and without which the event would not have occurred." *King v. Ellis*, 359 S.W.2d 685, 688 (Mo. 1962).

Morgan Keegan has not directed the Court to the law of any other state concerning

this tort.  The Plaintiffs briefed the elements of a common law negligence claim in the 19 states at issue, and they are the same as Missouri's.  [Doc. 357, pp. 42-45 of 54.]  Based on this record, it appears the outcome of Plaintiffs' negligent underwriting claim would be the same under any state's law, and the Court need not undertake a conflicts analysis. *See Kamrath,* 475 F.3d at 924.   The Court will apply Missouri common law.  Further, even if the Court had conducted a conflicts analysis under the Restatement (Second) of Conflict of Laws (1971), it would reach the same conclusion.

Common questions of law predominate with respect to this claim, as well as common questions of fact.  Morgan Keegan was the underwriter of the bond.  It owed a duty as a matter of law to the persons who could foreseeably be injured by its carelessness, the investors.  [Order, Doc. 41, p. 8 of 27.]  The Plaintiffs allege Morgan Keegan owed a duty of care, breached it by failing to perform its due diligence, and that as a result, the investors suffered damages including the loss of their investments.  This claim, unlike negligent and fraudulent misrepresentation, does not depend on proof of the Plaintiffs' individual reliance, but on the Defendants' conduct.  The Defendants' liability, under the Missouri common law, may be established with common evidence. Predominance is met.  *See Avritt,* 615 F.3d at 1029.

### e.  Unjust enrichment, and moneys had and received

Finally, the Plaintiffs seek certification of their claims against both Defendants for unjust enrichment and moneys had and received.[1]   While each state in the United States

---

[1] Unjust enrichment and monies had and received constitute the same suit under Missouri law.  *Fulton Nat. Bank v. Callaway Mem'l Hosp.*, 465 S.W.2d 549, 553 (Mo. 1971);

23

describes unjust enrichment differently, the essence of such claims is that the defendant obtained a benefit, the plaintiff suffered an economic detriment as a result, and it would be inequitable for the defendant to keep the benefit under the circumstances. While some states break down the claim into four or five elements, and others identify only three, all cover the same basic issues. For example, to prove a claim for unjust enrichment under Missouri law, the plaintiff must demonstrate that "(1) he conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010). In determining whether an enrichment was unjust, the Court considers "whether any wrongful conduct by the defendant contributed to plaintiff's disadvantage." *Graves v. Berkowitz*, 15 S.W.3d 59, 61 (Mo. Ct. App. 2000). Enrichment is unjust when "a person retains the benefit and enjoys the benefit conferred upon him without paying its reasonable value." *Webcon Group, Inc. v. S.M. Properties, L.P.*, 1 S.W.3d 538, 542 (Mo. Ct. App. 1999). [Doc. 41, pp. 21-22.] Recovery for unjust enrichment is unavailable when a person has voluntarily entered into a risky business venture in pursuit of his own financial advantage. *JB Contracting Inc. v. Bierman,* 147 S.W.3d 814, 820 (Mo. Ct. Ap. 2004). But a mistake of fact affects voluntariness of payment, and if a plaintiff confers a benefit as a result of mistake of fact, the plaintiff is entitled to restitution. *Homecomings Fin. Network, Inc. v. Brown,* 343 S.W.3d 681, 685 (Mo. Ct. App. 2011). [Doc. 41, pp. 22-23.] Thus, while Missouri has only three stated

---

*Investors Title Co., Inc. v. Hammonds*, 217 S.W.3d 288, 293 (Mo. 2007); *Hargis v. JLB Corp.*, 357 S.W.3d 574, 586 (Mo. 2011).

elements, the catch all third element - retention of a benefit under unjust circumstances - incorporates several concepts that other states break out into separate elements. However, according to Morgan Keegan, Alabama and Texas have imposed a heavier burden than other states by requiring proof that the defendant engaged in fraud, coercion or other intentional conduct. Because there seems to be a meaningful variation in Missouri, Alabama and Texas law and because it is uncertain at this time how many class members would be affected by that variation, it is premature to grant class certification on Plaintiffs unjust enrichment claim. Further, the exact parameters of Plaintiffs' unjust enrichment claim are unclear at this time and this makes a choice of law analysis difficult since the inquiry is issue specific. Therefore, the Court denies without prejudice, Plaintiffs' request for class certification of their unjust enrichment claim.

### f. Damages model

Rule 23(b)(3)'s predominance requirement also applies to questions of damages, which must be capable of measurement on a class-wide basis. *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1433 (2013). Both Defendants argue that there is no predominance because the Plaintiffs failed to offer a damages model per *Comcast*. The Plaintiffs did not provide a measure of damages in their motion for class certification because, they say, it should be beyond dispute that the measure of damages each class member is entitled to is a question common to the class.

In *Comcast,* the plaintiffs proposed four complex theories of antitrust impact on, or distortions of, the cable television market, and offered an expert's regression model comparing actual cable prices in the region affected, to hypothetical cable prices that

would have prevailed but for the defendant's allegedly anticompetitive activities. 133 S.Ct. at 1431. The model accounted for damages flowing from all four theories and did not differentiate between them. 133 S.Ct. at 1433-34. The district court certified the class on only one of the four theories, and refused to hear argument against the damages model that bore on the propriety of class certification, notwithstanding that the only model provided was based on the existence of all four alleged theories or distortions. *Id.* The Supreme Court reversed because the damages model was not tailored to the sole issue of liability that was certified. *Id.*

Since *Comcast,* class defendants have attempted to have classes decertified based on individualized differences in class members' damages. Courts have not read *Comcast* so broadly, instead holding that it simply requires a plaintiff to show a linkage between its theory of liability and theory of damages. *See Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 588 (S.D.N.Y. 2013); *In re Nexium (Esomeprazole) Antitrust Litig.*, 2013 WL 6019287 (D. Mass. Nov. 14, 2013) (same). Some courts have limited application of *Comcast* to antitrust cases. *E.g., Giles v. St. Charles Health Sys., Inc.,* 2013 WL 5774124 (D. Or. Oct. 22, 2013) (holding *Comcast* inapplicable to wage and hour claims under federal and state law); *Neale v. Volvo Cars of N. Am. LLC,* 2013 WL 5674355 (D.N.J. Oct. 16, 2013) (finding *Comcast* inapplicable to class warranty action). *Comcast* has also been held inapposite where the measure of damages "will be single, uniform and purely mechanical[.]" *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 293 F.R.D. 287, 305-06 (E.D.N.Y. 2013).

Faced with such an issue, the Seventh Circuit held, more generally:

It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification. Otherwise defendants would be able to escape liability for tortuous harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits.

*Butler v. Sears, Roebuck and Co.,* 727 F.3d 796, 801 (7th Cir. 2013) (Posner, J.).

Here, the linkage between the Plaintiffs' theory of liability and theory of damages is straightforward:  The Plaintiffs claim that they paid valuable consideration for the bonds and the bonds are now worthless.  To the extent that the Plaintiffs or any class members resold the bonds, the amount gained from the resale is deducted from the damages.  [Doc. 289, pp. 21 of 32.]  Such variation does not defeat the common issue of liability and the calculation of damages is based on a single model applicable to all members of the class.  The application of that model to each class member is merely mechanical and may even justify summary judgment based on record evidence of sales, unless those records are disputed.   Clearly predominance under these circumstances is satisfied.

## 2.  Whether class action is superior to other available methods of adjudication

Rule 23(b)(3) also requires that the Court determine whether a class action is superior to other possible methods of fairly and efficiently resolving the controversy.   The Plaintiffs have demonstrated superiority.

27

In determining whether superiority is met, the Court considers:

A. the interest of members of the Class in individually controlling the prosecution of separate actions;

B. the extent and nature of any litigation concerning this controversy already commenced by potential Class members;

C. the desirability of concentrating the litigation of the claims in this particular forum; and

D. the difficulties likely to be encountered in the management of a class action.

With respect to the first factor, the three Plaintiffs are the only persons who have come forward seeking to act as lead plaintiffs in a class action concerning these claims. They have retained counsel with considerable experience in the prosecution of class action and federal securities law claims.

As discussed above, about 80 putative class members have arbitration clauses in their customer agreements with Morgan Keegan, which would require them to bring their claims in a FINRA arbitration proceeding if brought individually and if a class is not certified. Armstrong Teasdale was not a party to those arbitration agreements and nothing in the record indicates that Armstrong Teasdale would agree to participate in arbitration. Therefore, class members with arbitration agreements may not be able to obtain relief against all tortfeasors in a single forum if the class is not certified.

Under the circumstances, and given the predominance of common questions, the alternatives to class litigation are more burdensome for individuals than participating in

class litigation. Class action is the most efficient way to resolve the questions of law and fact common to all Bond purchasers.

The second factor, the extent and nature of any litigation concerning this controversy already commenced by potential Class members, also militates in favor of certification here. The record before the Court shows that about four cases have been filed in Missouri state courts by a total of about 33 of the 133 Bondholders to-date. Those Bondholders who have already commenced a legal proceeding could simply opt-out of this class if they concluded individual litigation is preferable. Regardless, the vast majority of Bondholders have not filed their own suits.

The third factor, the desirability of concentrating the litigation of the claims in this particular forum, favors certification. The City of Moberly is located in this district and the district is centrally located in the state.

Last, the Plaintiffs' counsel, who has substantial experience in class action litigation, does not anticipate any significant or unusual difficulties in the management of this action as a class action. The Court does not see any unusual difficulty either.

Therefore, the class action device is the superior method for adjudicating the claims of the proposed Class members identified above.

### 3. Affirmative defenses

Morgan Keegan asserts in its supplemental briefing that its affirmative defenses relating to calculation of damages—comparative fault and contribution among joint tortfeasors—fatally undercut any finding of predominance or superiority, because the defenses require individual damages calculations. [Doc. 362, pp. 48-50 of 53.]

29

In drafting Rule 23, the Advisory Committee stated that individual damage calculations should not scuttle class certification under Rule 23(b)(3), noting that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. 39 F.R.D. 69, 102-103 (1966). "Therefore, courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations and a recent dissenting decision of four Supreme Court Justices characterized the point as 'well nigh universal.'" Wm. Rubenstein, Newberg on Class Actions, § 4:54 (Winter 2013 Supp.) (citing *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1437 (2013)(Ginsberg and Breyer, JJ., joined by Sotomayor and Kagan, JJ, dissenting)). *See also Alpern v. Utilicorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir. 1996) (noting that "[t]he fact that damage calculations might differ slightly [between plaintiffs] is a minor matter in comparison with [the] fundamental similarities" of the plaintiff's and class members' claims challenging defendant's course of conduct).

As discussed elsewhere, the three Plaintiffs and the class members have fundamentally similar claims against the Defendants. Whether the affirmative defenses require individualized damage determinations, Morgan Keegan has pointed out nothing about the affirmative defenses that makes them unique or unusually important in the context of this case. The differences in calculation of damages, should the defenses apply, is a minor matter in comparison with the fundamental similarity of the claims.

Furthermore, "where common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses." *Smilow v. South Western Bell Mobile Syst.*, 323 F.3d 32, 39 (1st Cir. 2003) (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 138-40 (2nd Cir. 2001), *Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 924 (3rd Cir. 1992)); *see also Eastwood v. So. Farm Bureau Cas. Ins. Co.*, 291 F.R.D. 273, 286 (W.D. Ark. 2013) (same). "If, moreover, evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms." *Smilow*, 323 F.3d at 40 (citations omitted).

**A**ffirmative defenses do not destroy predominance and superiority with respect to the claims identified for certification.

## III. Conclusion

The Plaintiffs' Motion for Class Certification [Doc. 218] is granted in part and denied in part. The Court certifies the Plaintiffs' claims for violation of the Missouri Blue Sky law, and negligent underwriting. The Motion for Class certification is otherwise denied.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: September 23, 2014
Jefferson City, Missouri